EUGENIA PALMER, EGBERT PALMER, FRED BARNES and J. W. HOUSTON, as Administrator of the Estate of W. D. PALMER, Deceased, Respondents, v. IDA M. PALMER, Appellant.

No. 1426.    (72 Pac. 3.)

2. Husband and Wife:  Contract for Divorce:  Construction.

A contract between a husband and wife recited that on account of irreconcilable differences a permanent separation was desirable, and a divorce in contemplation, and settled on her a very inadequate part of the property in lieu of alimony, and concluded with the express stipulation that they agreed, so far as permitted by law, to a dissolution of the marriage relation. It was shown that the wife was induced to sign the agreement on the representation that otherwise she would not receive any of the property, and that she instituted unsuccessful proceedings

for a divorce the next day after executing the contract. . *Held,* that the contract was not one for a mere separation, but for the purpose of facilitating the securing of a divorce.

3. **Same: Public Policy: Validity:**
An agreement between husband and wife calculated to facilitate the securing of a divorce *a vinculo matrimonii* is contrary to public policy and void.

1. **Same: Comity.**
The principle of comity can not be invoked to require one State to enforce a contract entered into in another, where the contract is in contravention of the public policy of the State in which en-. forcement is sought.

4. **Same: Dissolution of Marriage Contract.**
While a husband or wife, or both, may violate the terms and obligations of their marriage contract, yet neither one, nor both combined can rescind or modify it except as provided by the law of the land.[1]

5. **Same: Bar to Widow's Right of Inheritance.**
Where a husband, through unfair advantage and unwarranted coercion, secured the signature of his wife to a contract to facilitate the procuring of a divorce, which he desired, and by such contract succeeded in gaining her consent to take as her share a fractional part of the property, such contract is void, as against public policy, and does not bar the wife from her right of inheritance in the property of the husband on his death.

## (Decided April 13, 1903.)

Appeal from the Third District Court, Salt Lake County.—*Hon. W. C. Hall,* Judge.

Action in equity brought by the heirs and the administrator of the estate of W. D. Palmer, deceased, to quiet title to certain property owned by the deceased in his lifetime. From a decree in favor of the plaintiffs, the defendant appealed.

REVERSED.

*Messrs. Pierce, Critchlow & Barrette* for appellant.

[1] Hilton v. Roylance, 25 Utah 129, 69 Pac. 660; 58 L. R. A. 723; Norton v. Tufts, 19 Utah 470, 57 Pac. 409.

In other words, an agreement renouncing marital rights and obligations is void. Those rights and obligations cannot be renounced without the consent and sanction of the State or its courts; an agreement touching property rights, even though made between a husband and wife who are living separate, and in the light of that separation, may be valid; an agreement wherein both the elements are mingled, each part and parcel of the other, and one a consideration for the other, is void. Foote v. Nickerson, 48 Atl. 1088 (N. H.); McKennan v. Phillips, 37 Am. Dec. 438; Simpson v. Simpson, 4 Dana 140 (Ky.); 15 Am. and Eng. Ency. of Law (2 Ed.), p. 955; (Future Separation and cases); Baum v. Baum, 53 L. R. A. (Wis.) 652; Collins v. Collins, 93 Am. Dec. (N. C.) 606 (until changed by statute); Andrus v. Randon, 34 Texas 536; 1 Bishop, M. D. and S., 1260 et seq., 1312.

It is the first duty of every State to look to its own subjects. Comity does not require that an agreement shall be construed to accord with the laws of another State if, so construed, it would violate the public policy of this State. Welling v. Eastern Building & Loan Association, 34 S. E. (S. C.) 409; Pope v. Hanke, 155 Ill. 67, 40 N. E. 839; Keller v. Paine, 13 N. E. (N. Y.) 635; Hervey v. R. I. Locomotive Works, 93 U. S. 664; Seamans v. Temple Co., 28 L. R. A. (Mich.) 430; Rose v. Kimberly, 27 L. R. A. (Wis.) 556; Mumford v. Canty, 50 Ill. 370; Faulkner v. Hyman, 142 Mass. 53.

A contract between husband and wife, having for its object the procurement of a divorce, or facilitating that result, is collusive and void. Greenhood on Public Policy, 490-491; Beard v. Beard, 65 Cal. 354; Loveren v. Loveren, 106 Cal. 509; Sayles v. Sayles, 53 A. D. 208 and notes; 11 Bishop M. D. & S., secs. 249, 251, 252; 15 Am. and Eng. Ency. Law (2 Ed.), p. 956 (e), and cases; Adams v. Adams, 25 Minn. 72; Muckenberg v. Holler, 92 A. D. 345; 2 Am. and Eng. Ency. Law (2 Ed.), p. 127 (c), and cases; Phillips v. Thorpe, 10 Ore. 494; Stebbins

v. Morris, 47 Pac. (Mont.) 642; Hamilton v. Hamilton, 89 Ill. 349; Seeley's Appeal, 14 Atl. (Conn.) 291; Belden v. Munger, 80 Am. Dec. (Minn.) 407; Stoutenberg v. Lybrand, 13 Ohio State 228; Hardy v. Smith, 136 Mass. 328; Blank v. Nohl, 19 S. W. (Mo.) 65; Blank v. Nohl, 20 S. W. (Mo.) 477; Wilde v. Wilde, 56 N. W. (Neb.) 742; Baum v. Baum, 52 L. R. A. (Wis.) 653; 1 Bishop 72, 73, 76.

*Messrs. Stephens & Smith* and *W. B. Willingham, Esq.,* for respondents.

### STATEMENT OF FACTS.

This is an action in equity brought by heirs and the administrator of the estate of W. D. Palmer, deceased, against the defendant, to quiet title to certain property owned by deceased in his lifetime. Among other things, it is alleged in the complaint that said W. D. Palmer and the defendant on December 27, 1886, intermarried, and cohabited as husband and wife until about April 24, 1899, when irreconcilable differences arose between them; that about August 11, 1899, a contract of separation was made and entered into, and the property rights settled between the parties thereto; that, in accordance with this contract, the wife received real estate situate in the city of Atlanta, State of Georgia, of the value of $12,000, subject to an incumbrance of $5,000, and furniture in the house upon the real estate of the value of $3,000, and cash in the sum of $6,500; that at the time of the execution of the contract the husband was worth not to exceed $30,000; that the property in question herein is situate in the State of Utah, where the husband resided from about the time of his permanent separation from his wife; that the defendant was a non-resident until his death; and that the husband carried out the terms of the agreement. The laws of the State of Georgia, under which the contract was claimed to have been made, were also pleaded. To the complaint the defendant filed a demurrer, which was overruled. There-

after she filed an answer in which, *inter alia*, she admitted the marriage, the execution of the contract, the residence of her husband in Utah since then, and her non-residence.  Affirmatively she then alleged that at the time of the death of the husband she became, and still is, the surviving wife and widow of the deceased; that, as such widow, the deceased having left no issue living, she is entitled, under the laws of Utah, to $5,000 in value of his real and personal property, and to one-half of the excess over $5,000 in value thereof; that after their marriage, the husband treated her with kindness and consideration until he became addicted to the use of liquor in excess in "periodic sprees," when he was harsh, cruel and vindictive to her; that her remonstrances against the drinking habits caused him to be only more harsh and vindictive towards her, until about the latter part of April, 1899, she, at the suggestion of her husband, who furnished her with the funds therefor, made a visit to Indianapolis, in the hope that upon her return he would treat her with his former kindness and consideration; that while so absent he sold out his property in the State of Georgia, left the State with the proceeds, notified her that he would never return while she was in the State, and concealed his whereabouts from her; that, while she was endeavoring to locate her husband, H. L. Culberson, his cousin and attorney, and the pretended friend of the wife, offered to pay her $6,500, upon the express condition that she would agree to an absolute divorce, without alimony; that Culberson refused to disclose where her husband was, but informed her that he had left the State with all his property, and was beyond the jurisdiction of the courts of Georgia, and advised her, as her friend, to accept the offer of $6,500; that, not knowing the whereabouts of her husband. and relying upon the statements and protestations of friendship of Culberson, and being without means for her support, she agreed to accept the offer and execute the contract, which was signed and delivered under an ex-

press agreement, extorted from her, that she should proceed to procure a divorce from her husband; that on the next day after the execution of the contract a suit for divorce was filed in accordance with the dictations of the attorneys for her husband, which, upon trial, failed; that the contract was the result of fraud and improper influences exerted against her; that it was fraudulently obtained and is void; that the property mentioned in the complaint and in the contract as of the value of $12,000 was given to her by her husband in 1895, when his drinking habit had not yet estranged him from her, and at a time when her father had given him great assistance in his then financial embarrassment; that said property was of the value of about $9,500, subject to a mortgage of $5,000; and that at the time of the execution of the contract her husband was worth $50,000 in cash.

From the evidence it appears that on December 27, 1886, Mr. and Mrs. W. D. Palmer were married at Indianapolis, Ind., her maiden name being Ida Moody. Thereafter they lived at Macon and Atlanta, Ga., about thirteen years, and had one child born to them, who died in childhood. When they moved to Atlanta, in 1890, Palmer had, in all, about $6,000, which he invested in stock in a brick plant. Shortly afterwards the other stockholders were about to "freeze him out." Mr. L. D. Moody, Mrs. Palmer's father, learning of this, came to her husband's rescue, advanced him money and credit, and saved him, it appears, from financial ruin. Up to August, 1898, the advancement of Moody to Palmer amounted to $17,333, and in February, 1899, Moody accepted in satisfaction for that amount the sum of $14,000. Palmer's business, it seems, was profitable, for in July, 1899, when he sold out, he cleared up about $42,000, of which about $30.000 was in cash, and $12,000 in a note of the purchaser; and this exclusive of the house given to his wife in 1895. In the course of time he developed drinking habits, which met with strong opposition from his wife, and resulted in disagreements

between them.  In the latter part of April, 1899, Mrs. Palmer made, with the sanction of her husband, who furnished her with the means with which to go, a visit to her parents, at Indianapolis.  After she was gone they corresponded together as husband and wife, and she says that, while his drinking habits had become almost unendurable, yet she fully expected to return and live with him.  While she was so on the visit, her husband sold out his property without her knowledge, and on July 12, 1899, wrote her what he had done, and that he intended to leave the State of Georgia, never to return so long as she was in it; that he had left her residence undisturbed just as she had left it; that all communications must cease forever; and that he had instructed his cousin H. L. Culberson to render her any assistance he could in securing a divorce, which he thought was the best thing to do, under the circumstances.  After receiving this letter, she returned to Atlanta, called on Culberson, and found that her husband had in fact gone, and taken his property in cash with him, but Culberson refused to reveal his whereabouts.  She then employed attorneys to assist her to obtain her rights by suit or settlement, and went to New York, where she employed detectives to locate the whereabouts of her husband, in the hope of securing a settlement from him, or service of process, so as to settle the matter in court.  Being, after much effort, unable to find him so as to get in direct communication with him, and not knowing or being able to ascertain what his real financial condition was, she finally agreed to accept an offer, made by her husband, through his friend, of the $6,500 mentioned in the contract; fearing, as had been suggested to her, that otherwise she might get nothing at all.  Testifying concerning this, after stating that she went to New York, she, in part, said: ''After further consultation with my attorneys, I went to New York, where I supposed Mr. Palmer was, and through detectives located him.  I did not get to see him.  Then I got a letter from Mr. Hanson saying Mr. Palmer had returned to Macon.  I returned

to Atlanta.   After consultation with Thompkins & Al-
ston, Mr. Alston went to Macon, had an interview with
Mr. Hanson, and returned with an offer of $6,500 made
by Hanson for Palmer.   Judge Thompkins advised me
to accept the $6,500, because it was the best I could do
under the circumstances.  At first I refused, but the next
day, with this mortgage of $5,000 still hanging over
me, and the thought that the foreclosure of it would lose
me my home, I agreed to accept the $6,500, with the
agreement that I was to file suit for divorce at once.
It was about twelve days between the time I first saw
Mr. Culberson and the time of the signing of the agree-
ment.   I was trying all that time to locate Mr. Palmer,
and find out the things that were being concealed from
me; that is, whether Mr. Palmer's property had been
sold, or what it brought, or his whereabouts.   I only
succeeded in locating him in New York, but he evaded
the detectives and got out of there.   I did not draw that
contract, neither did my attorneys.   I first saw the con-
tract the day I signed it.   I read it, and read so
much of it which says:   'A divorce proceeding is
in contemplation, and will be instituted by one or
the other of said parties.'   Pursuant to that agree-
ment, I filed a divorce proceeding.   It was filed
the next day.   I do not know whether or not the
divorce petition was drafted when I signed the
agreement, but I know it was to be drafted, and as a part
of this settlement.''   After she accepted the terms and
signed the contract, her husband, in response to a tele-
phone message, appeared in the office of his attorney,
and, in her absence, also signed the contract.   The in-
strument was executed August 11, 1899, and the next
day the divorce proceedings were instituted, but upon
trial before a jury the case failed.   Soon after the exe-
cution of the contract, the husband came to this State,
purchased the property involved in this controversy,
and resided here until May, 1901, when he died intes-
tate.   His wife, it appears, never saw him again after
she left home for her visit at Indianapolis.   At the trial

of the cause the court entered a decree quieting the title to the property in the plaintiffs, and held that the defendant is perpetually estopped and enjoined from setting up any claim to any part thereof. Thereupon the defendant prosecuted this appeal.

BARTCH, J., having made the statement of the case as above, delivered the opinion of the court.

The principal and decisive question in this case is whether the contract pleaded and relied upon by the plaintiffs is valid and bars the widow's right of inheritance. So far as material here, it reads: "Whereas, irreconcilable differences have arisen between W. D. Palmer and his wife, Ida M. Palmer, and in consequence thereof a permanent separation between them is desirable, and a divorce proceeding is in contemplation and will be instituted by one or the other of said parties, for the legal dissolution of the marriage tie existing; and, whereas, the said W. D. Palmer is willing to make a satisfactory settlement upon and with the said Ida M. Palmer in lieu of all claims for alimony against him, either temporary or permanent." And then, after mentioning the property the wife was to have, which is the same as that described in the pleadings, and making some stipulations in respect thereof, it concludes: "Now, therefore, this instrument of writing witnesseth the mutual agreement, contract and settlement above described, and the said Ida M. Palmer hereby acknowledges the receipt of said sum of money cash in hand paid by him, the said W. D. Palmer, and in consideration thereof as well as the amounts heretofore received, hereby acknowledges full and satisfactory payment by him of all claims she has against him, and agrees in consideration thereof to, and does hereby, release him from all liability past, present or future for her support, maintenance or comfort, and they both hereby contract and agree so far as they are by law permitted to do, each for the other, to full and final separation and dissolution of the marriage relation, and all responsi-

bility of every character of the one for the other is here-
by forever ended.''

The appellant, among other things, contends that
this is a contract between husband and wife, entered into
for the purpose of procuring a divorce, or of facilitating
such a result, and is therefore collusive and void. The
respondents insist that it amounts merely to a separa-
tion agreement, settling the property rights of the par-
ties, and that it is authorized by the laws of the State of
Georgia, where it was made and executed, and should
be enforced, through comity, in this State.

Whether or not the contract is valid and enforcible
under the laws and decisions of the State of Geor-
gia, it is not necessary to decide, for it clearly ap-
pears from the face of the instrument that it is invalid
under our laws and decisions; and, when read in light
of the facts and circumstances disclosed by the evidence,
the conclusion becomes irresistible that it ought not to
and cannot be enforced in this State, even if enforcible
in the State where made. The principle of comity can-
not be invoked to enforce the laws of a foreign State
which are inimical to the interests of the State where
their enforcement is sought. Nor will a contract exe-
cuted in one State be enforced in another if it is in con-
travention of the public policy of the latter State. Com-
ity between different States requires no State to uphold
or enforce contracts which injuriously affect the wel-
fare of its subjects, or contravenes its own laws, insti-
tions or policy. In such cases, when the *lex loci contrac-
tus* comes in conflict with the *lex fori,* comity must yield
to the positive law and policy of the forum. Story on
Conflict of Laws, sec. 327; Pope v. Hanke, 155 Ill. 617,
40 N. E. 839, 28 L. R. A. 568; Seamans v. Temple Co.,
105 Mich. 400, 63 N. W. 408, 28 L. R. A. 430, 55 Am. St.
Rep. 457.

We are clearly of the opinion that the contention
of the appellant is sound. That the contracting
parties contemplated a divorce *a vinculo matrimonii*
seems apparent. Differences had arisen between hus-

band and wife which appeared to them irreconcilable, and in the very first sentence of the instrument it is stated expressly that a "permanent separation between them is desirable, and a divorce proceeding is in contemplation and will be instituted by one or the other of said parties, for the legal dissolution of the marriage tie existing." This language is plain, unambiguous, and clearly shows that the design of the parties was to absolve all marital relations existing between them; and, if there is any doubt that the contemplated divorce was a moving cause for the contract, such doubt would seem to be removed upon perusing the concluding paragraph of the instrument, where they say "they both hereby contract and agree so far as they are by law permitted to do, each for the other, to full and final separation and dissolution of the marriage relation, and all responsibility of every character of the one for the other is hereby forever ended." In the face of such language, is it not idle to say or contend, as do counsel for the respondents, that this is a mere contract for separation, and cannot be construed into an agreement to facilitate a divorce? The parties to the instrument say "a divorce proceeding is in contemplation," and that they agree, so far as they think the law permits them to do, "to full and final separation and dissolution of the marriage relation." They, in effect, stipulate that all their marital responsibilities shall be forever ended. It is difficult to see by what process of reasoning such a contract can be construed to be anything else than an agreement to facilitate a divorce, or an attempt to put an end to the marriage status by mutual agreement of the parties. It is true it was not stipulated in the instrument which one of the parties was to institute the divorce proceedings in court, but that appears from the testimony. So the consideration and motive which induced the parties to enter into and execute the contract appears from the evidence, as well as upon the face of the instrument itself.

The wife, in substance, testified that before the exe-

cution of the contract she was unwilling to have a divorce; that when given to understand that a divorce was the consideration in order for her to get anything from her husband, who was keeping himself concealed from her, she refused to apply for one; that she then employed Thompkins & Alston, as her attorneys, to assist her in procuring a settlement; that finally, through a mutual friend, her husband offered her the $6,500 mentioned in the contract, in addition to the other property referred to therein; that upon the advice of her counsel to accept it, as the best she could do under the circumstances, and fearing the mortgage of $5,000, which was hanging over her, and which might lose her her home, she accepted the offer, with the agreement that she was to file suit for divorce at once, although she had at first refused to do so; and that the next day after the execution of the contract, pursuant to and in fulfillment of the agreement, the divorce proceedings were instituted by her, the papers for which had been prepared as a part of the settlement. The witness further stated: "The reasons Judge Thompkins assigned for advising me to accept the offer of settlement were that there was no property belonging to Mr. Palmer in the State that we could attach; that he had the cash, and he could get out of the State, and I couldn't get service on him; therefore he had put himself in a position where it was thought, if I let that offer go, I wouldn't get anything at all." As to much of this and other similar testimony, the wife is corroborated by that of other witnesses. The witness Alston, speaking with reference to the preparation of the papers for the divorce proceeding before the consummation of the contract, said: "I did that because I knew there would be no opposition to the divorce, as both sides wanted it;" and then, in reference to the question of the settlement, or of fighting the case in the courts, the witness said, "We would have fought it if we had been out in the open, and if he had been where we could have served him." That a divorce was in the mind of at least the husband before the con-

summation of the contract also appears from a letter in evidence, written by him to his wife, dated July 14, 1899, wherein, after informing her that he had disposed of all his property and would leave the State, he said: "With this letter let all communication cease forever. My cousin Hubert will represent me during my absence. I have instructed him to render any assistance he can in securing a divorce, which seems to be the best thing to do under the existing circumstances." It is true, the witness Culberson, who was the "cousin Hubert" mentioned in this letter, and the husband's attorney, at first testified that his client had left him "no instructions relative to a divorce proceeding to be instituted by his wife or himself," but when confronted with the letter dated July 19, 1899, written by the witness to Mrs. Palmer, wherein he said, "He [meaning the husband] gave me no instructions to sue for a divorce, but seems to think that was what you'd do and asked me to aid you in all ways possible in event you did," and in another letter to her dated June 3, 1899, had said, "Of course a divorce is inevitable, and after the settlement is made, if it can be made, the next question would be where the divorce proceedings should be instituted"— he admitted that his client had instructed him to assist in all ways possible to secure a divorce.

Further reference to the evidence in detail would be useless, for, like upon the face of the contract, it is clearly shown by the proof that the procuring of a divorce was in the minds of the parties before and at the time the instrument was executed, and was a moving consideration. The fact that the very next day after the execution of the instrument the wife instituted the divorce proceedings is significant, as tending to show that she endeavored in good faith to comply with her understanding of the agreement, although, as seems evident, from a careful perusal and consideration of the evidence, she never entered into the contract voluntarily but simply as the victim of circumstances over which she was led to believe she had no control. The record

is quite convincing to the mind that the intention of the husband was to sever all marital relations existing between him and his wife, and that the wife was induced through unfair means to sign the agreement. Such being the case, the contract must be regarded as one executed for the purpose of facilitating the procuring of a divorce, and not as a mere separation agreement. It amounts to a mutual agreement, in writing, of the husband and wife, to dissolve the marriage and absolve themselves from all marital obligations. The agreement, therefore, being one calculated or intended to facilitate the securing of a divorce *a vinculo matrimonii*, is contrary to the policy of the law and is void. The law is well settled that courts will refuse to enforce any contract, as against public policy, which is intended to promote the dissolution of the marriage status. Greenhood on Public Policy, 490-491. When that status is created the rights involved are not merely private, but they are also of public concern. The social system and welfare of the State having their foundation in the family, the State is an interested party, and therefore the marriage relations cannot be dissolved except through the sovereign power. It is true, either the husband, or wife, or both, may violate the terms and obligations of the contract; but neither one, nor both combined, can rescind or modify it except as provided by the laws of the land. This subject was discussed in Hilton v. Roylance, 25 Utah 129, 139, 69 Pac. 660, 58 L. R. A. 723, and it was there said: "Marriage, strictly speaking, is not a mere civil contract, but a status created by contract. 1 Bish. Mar. & Div., sec. 34. It is true, it is founded in consent of the parties, but the consent is the contract because of which the status is created. Marriage differs from ordinary contracts, in that it can only exist where one man and one woman are legally united for life, whereas ordinary civil contracts may exist between two or more of either or both sexes for any stipulated time. So the marriage relation differs from other contractual relations, in that,

when the status is once created, the State becomes an interested party, and thereafter the marriage, with the rights and duties assigned by the law of matrimony, is not subject, as to its continuance, dissolution, or effects, to the mere intention and pleasure of the contracting parties. The marriage, with its privileges, obligations, rights, and duties, which are or may be assigned by the law of matrimony for the establishment of families and the multiplication and education of human kind, continues during the life of the parties, and no dissolution of the status can be effected simply by the mutual consent or agreement of the parties. It is regulated and controlled and can be dissolved only through the sovereign power of the State whenever justice to either or both parties or the welfare of the public demands it." Norton v. Tufts, 19 Utah 470, 57 Pac. 409.

Moreover, where, as appears in this instance, the parties agree that the one shall bring a suit to dissolve the marriage, and that the other will make no defense, or a mere nominal defense, which is indicated by the context, the agreement becomes collusive and fraudulent, and is without validity. A contract of this character may be regarded not only as conceived in fraud, but as a fraud upon the court, and it comes within the reason of the maxim, "*ex turpi causa non oritur actio.*" Mutual agreement of a male and female who are of the requisite age and capacity may create the marriage relation, but it can never dissolve it. The State being founded upon the family, so high is the marriage status regarded by mankind, so necessary is its permanency to promote the public welfare and private morals, that the State, to every marriage contract entered into within its jurisdiction, makes itself a party, in the sense that it will not permit its rescission or dissolution except for a cause provided by law, the existence of which is to be ascertained by a court of competent jurisdiction, upon evidence regularly submitted, in a proper proceeding instituted in good faith for that purpose. The parties cannot even consent to a decree in open court, nor stipu-

late as to the facts. The decree must be based on abso-
lute proof. The welfare of humanity, the intelligence
and progress of the human race, high moral and social
ethics, alike demand this. Any other method or de-
vice by which the contracting parties attempt to sever
or to facilitate the severing of the bonds of matrimony,
in the eye of the law, contravenes public policy, is re-
garded as *contra bonos mores,* and is void and ineffect-
ual. Therefore a contract which is designed to facilitate
the procurement of a divorce, to put an end to the mar-
riage status, and absolve the parties from all their mar-
ital obligations, imposed upon them by the law of matri-
mony, cannot be enforced. "As the policy of the law
is to preserve intact the marriage, if possible, all re-
quirements which have for their object or which con-
template a future separation between husband and wife
are universally held illegal." 15 Am. and Eng. Ency.
of Law (2 Ed.), 955. In 1 Bish. on Mar., Div. and Sep.,
sec. 1261, the author says: "Since the law makes the
public a party to every suit for dissolution or separa-
tion, and forbids either form of divorce on the mutual
agreement of the parties, or on the connivance of one
of them to the other's wrong, any bargaining between
them for a future separation or for the procuring of a
divorce, or tending to the like end, being contrary to the
law and legal policy, is void." In Seeley's Appeal, 56
Conn. 202, 14 Atl. 291, it was said: "The law requires
husband and wife, in their relation to each other, to per-
form certain duties and refrain from committing cer-
tain wrongs. Taking note of human infirmity, and of
certain failure of some to do as it requires, or to refrain
from doing what it forbids, it makes possible a method
of release from the marriage contract upon proof that
its purpose must entirely fail of accomplishment. Every
decree of divorce must rest upon proof of such facts as
have been by the Legislature declared to be sufficient to
uphold it; not at all upon considerations as to rights of
property; not at all upon the wishes or agreements of
the parties. Courts will not enforce any contract which

is the price of consent by one party to the marriage relation to the procurement of a divorce by the other. The court is entitled to know in every case whether the particular marriage tie in question is or is not of sufficient strength to bear the strain to which the law has subjected it." So in Adams v. Adams, 25 Minn. 72, it was stated: "The authorities are uniform in holding that any contract between the parties having for its object the dissolution of the marriage contract, or facilitating that result, such as an agreement by the defendant, in a pending action for divorce, to withdraw his or her opposition and to make no defense, is void, as *contra bonos mores*." Likewise, in Phillips v. Thorp, 10 Or. 494, it was said: "So strict and careful are courts in the administration of this justice, out of regard for the public morals and the general welfare of society, that they will esteem it their duty to interfere upon their own motion whenever it appears the dissolution is sought to be effected by the connivance or collusion of the parties; and all contrivances or agreements having for their object the termination of the marriage contract, or designed to facilitate or procure it, will be declared illegal and void, as against public policy." And again in the same case: "An unlawful agreement, it is said, can convey no rights in any court to either party, and will not be enforced, in law or in equity, in favor of one against the other of two persons equally culpable." In Muckenburg v. Holler, 29 Ind. 139, 92 Am. Dec. 345, it was observed: "The law favors marriage, and cannot, therefore, sanction contracts intended to promote its dissolution, by lending itself to their enforcement. We know of no case in the books in which such an appeal to any court to compel the fulfillment of such a contract, or to award damages for its breach, has been successfully made." 1 Bish. Mar., Div. and Sep., secs. 76, 1312; 2 Am. and Eng. Ency. Law (2 Ed.), 127; Foote v. Nickerson, 70 N. H. 496, 54 L. R. A. 554; Beard v. Beard, 65 Cal. 354, 4 Pac. 229; Wilde v. Wilde, 37 Neb. 891, 56 N. W. 724; Loveren v. Loveren, 106 Cal. 509, 39 Pac.

801; Hamilton v. Hamilton, 89 Ill. 349; Sayles v. Sayles, 21 N. H. 312, 53 Am. Dec. 208; Stoutenburg v. Lybrand, 13 Ohio St. 228; Baum v. Baum (Wis.), 85 N. W. 122, 53 L. R. A. 650, 83 Am. St. Rep. 854; Collins v. Collins (N. C.), 93 Am. Dec. 606; Blank v. Nohl, 112 Mo. 159, 20 S. W. 477, 18 L. R. A. 350; Friedman v. Bierman, 43 Hun 387; Simpson v. Simpson, 4 Dana 140; Blank v. Nohl (Mo.), 19 S. W. 65; Belden v. Munger (Minn.), 80 Am. Dec. 407; McKennan v. Phillips (Pa.), 37 Am. Dec. 438.

It will thus be seen that, viewed and tested by the foregoing principles, the contract in controversy clearly contravenes the policy of the law and is void. Nor does it appear that the consummation of the transaction was the result of fair dealing. The conduct of the husband toward his wife was not such as to stamp it with fairness and justness. That the execution of the instrument by the wife was obtained through unfair advantage and unwarranted coercion on the part of the husband is a conclusion irresistible from an examination of the evidence. His consent and furnishing of the means for his wife to visit her parents; his selling out their property without her knowledge or assent, and leaving the State with the property in cash, while she was absent; his instructions to his attorneys to conceal his whereabouts; his keeping his wife in ignorance of the value of and amount obtained for the property; his threat that he would never return to the State while the one whom he had promised to love, protect, and support was in it; his grossly unequal division of the property, which, with the assistance of her father, they had accumulated during their married life—all these things, considered with the fact that his own intemperate habits, and consequent neglect of the duties he owed his wife, had brought on the estrangement then existing between them, savor much of the fraudulent, and militate strongly against the fairness and justice of the transaction which culminated in the contract. Not only the law, but a man's most sacred honor, as well as every

Palmer et al. v. Palmer.

principle of justice and equity, demands that he treat his wife at all times, and under all circumstances, respectfully, fairly, openly. Surely nothing less was due her. In that trying hour, when the cloud of disappointment and adversity was hanging over her, when she was to attach her signature to an instrument calculated to sever an alliance which had been made for life, she had a right to see her husband and talk with him face to face, and he had no right to conceal himself or anything relating to their affairs from her.

The record in this case is such as impels one to the thought that this is one of the sad, unfortunate cases where liquor, that prince of evil, blasted happy hearts and destroyed a happy home.

We are of the opinion that the appellant is not barred of her right of inheritance.

Having taken the view that the contract is without validity, it is unimportant to discuss the other points presented.

The judgment must be reversed, with costs, and the cause remanded to the court below, with directions to set aside the present findings of fact and the decree, and enter findings of fact and a decree in accordance herewith, in favor of the appellant. It is so ordered.

BASKIN, C. J., and McCARTY, J., concur.