Alfred NEILSON, Plaintiff and Respondent,

v.

Carleen NEILSON, Defendant and Appellant.

No. 870591–CA.

Court of Appeals of Utah.

Sept. 14, 1989.

M. Byron Fisher and Mark L. Mathie, Salt Lake City, for defendant and appellant.

Roger D. Sandack, Salt Lake City, for plaintiff and respondent.

Before BENCH, GARFF and JACKSON, JJ.

## OPINION

JACKSON, Judge:

In this appeal, Carleen Neilson challenges the trial court's ruling that the parties' premarital agreement was void and unenforceable as controlling property division upon divorce. We affirm.

## FACTUAL BACKGROUND

At the time of the parties' divorce, Alfred Neilson was a sixty-seven-year-old retired business executive whose primary source of income was dividends from his shares in Texas Eastern Corporation. Carleen Neilson was a thirty-one-year-old bank employee with a college degree in finance and accounting. They met and began dating in December 1985. On January 18, 1986, she was evicted from her apartment. Upon her request and his agreement, she moved into a private bedroom in his home three days later. On February 25, 1986, they executed a document entitled "Prenuptial Agreement," which was prepared by Alfred's attorney at his request.

Paragraph 9 of the prenuptial agreement provides:

At the time of executing this Agreement, ALFRED owns 25,440 shares of Texas Eastern Corporation stock. It will be necessary to sell certain shares of said stock to pay the taxes arising as a result

of prior stock sales, and it may be necessary in the future to sell additional shares of said stock. Nevertheless, ALFRED agrees to transfer to CARLEEN five percent (5%) of said stock (or any asset into which it may be converted) in each year for a period of nine (9) years with the intention that at the end of nine (9) years, each of them will own an equal number of shares of said stock. On the date of marriage, ALFRED shall transfer to CARLEEN five percent (5%) of said stock. On each anniversary of their marriage thereafter, ALFRED will transfer the fraction of the shares then owned by him as indicated on the following chart:

| Anniversary Date of Marriage | Fraction of Texas Eastern Shares Then Owned by Alfred to be Transferred to Carleen |
|---|---|
| 1 | 1/19th |
| 2 | 1/18th |
| 3 | 1/17th |
| 4 | 1/16th |
| 5 | 1/15th |
| 6 | 1/14th |
| 7 | 1/13th |
| 8 | 1/12th |
| 9 | 1/11th or such lesser amount as necessary to give CARLEEN the same number of shares as ALFRED. |

In the event the parties are subsequently divorced in a divorce action initiated by CARLEEN, it is understood and agreed that the only assets she shall be entitled to receive from the separate property owned by ALFRED are the shares of Texas Eastern Corporation stock which [have] theretofore been transferred to her. On the other hand, if the parties are divorced in an action initiated by ALFRED, CARLEEN shall be entitled to receive, as the only property to be transferred by the divorce to her from the separate property of ALFRED, sufficient shares of Texas Eastern Corporation stock so that she will own at the time of the divorce the same number of shares of said stock as will then be owned by ALFRED.

The wedding took place on March 1, 1986, and the marriage was consummated. In accordance with the agreement, Alfred transferred 1,272 shares of stock to Car-

leen at that time. Four and one-half months later, he filed a complaint for annulment of the marriage, based on allegations of fraud, and for a declaratory judgment of their respective rights under the prenuptial agreement. She answered with general denials and affirmative defenses. She also requested the court to declare his complaint to be one for divorce and to enforce their premarital agreement, claiming that the last sentence of paragraph 9 entitled her to half (worth approximately $400,000) of the Texas Eastern Corporation stock because Alfred had initiated an action that would result in divorce.

After a six-day trial, the court found that Alfred had paid off $8,200 worth of Carleen's premarital debts, purchased $12,592 in wedding jewelry for her, paid $9,600 for a 1978 Corvette and another $2,000 for a watch purchased by Carleen, and paid another $5,000 for miscellaneous benefits for her. Carleen was found to have expended excessive sums of Alfred's money for her own use and benefit, without Alfred's knowledge or authorization. These unauthorized purchases overdrew Alfred's checking account by $14,000 after completely consuming his quarterly dividend check in the amount of $16,000, requiring him to sell some stock to pay those expenses and the taxes owed for the sale of the stock. While this action was pending, Carleen sold 372 shares of the stock she had received when the parties married. At the time of the decree, the proceeds from that sale consisted of $2,000 in cash and a $10,000 time certificate of deposit in her name.

The trial court denied Alfred's petition for annulment and, with no objection from either party,[1] treated his complaint as one for divorce, which it awarded to him on the basis of mental cruelty and irreconcilable differences. Although the trial court specifically found that the prenuptial agreement was entered into without any fraud, duress, or undue influence, it nonetheless concluded that the entire agreement was

---

**1.** Alfred has not cross-appealed to challenge either the trial court's denial of his petition for annulment or its treatment of his complaint as one for divorce.

void and unenforceable as violative of public policy "for the reason that it encourages conduct designed to facilitate the breakup of a marital relationship." Alternatively, the court concluded that consideration for the prenuptial contract, a "normal marital relationship," had failed. The court then, in the exercise of its equitable powers, made a distribution of property. In addition to personal property she brought to the marriage, Carleen was awarded the following $35,600 worth of property she received during the marriage: the jewelry; the 1978 Corvette; the certificate of deposit; and the $2,000 in cash remaining from her sale of stock.[2] Alfred was awarded his remaining personal property, including the 900 stock shares previously transferred to Carleen that she did not sell during the parties' separation. Finally, Carleen was ordered to pay her attorneys $20,000 as reasonable attorney fees.

### ISSUES

On appeal, Carleen challenges as erroneous the trial court's refusal to enforce the parties' prenuptial agreement because consideration for the contract failed or because the contract terms violate public policy. She also contends that the trial court had no power to order her to pay her attorney fees.

This court has previously held that prenuptial agreements should be construed in the same manner as other contracts. *Berman v. Berman*, 749 P.2d 1271, 1273 (Utah Ct.App.1988). In interpreting a contract, a court looks first to the four corners of the agreement to determine the intentions of the parties. *Ron Case Roofing & Asphalt Paving Co. v. Blomquist*, 773 P.2d 1382, 1385 (Utah 1989). Resort to extrinsic evidence of the parties' intent is permissible only if the contract document appears to express the parties' agreement incompletely or if it is ambiguous in expressing that agreement. *Id.*

The standard of appellate review applicable to the trial court's interpretation of this unambiguous, integrated contract, determined by the words of the agreement itself, is well settled. Such an interpretation presents a question of law, which we review for correctness, giving the trial court's construction of the agreement no particular weight. *Copper State Leasing Co. v. Blacker Appliance & Furniture Co.*, 770 P.2d 88, 90 (Utah 1989); *Kimball v. Campbell*, 699 P.2d 714, 716 (Utah 1985); *Crowther v. Carter*, 767 P.2d 129, 130 (Utah Ct.App.1989).

### PUBLIC POLICY

We first consider the trial court's ruling that the prenuptial agreement was void and unenforceable because it violates public policy. Under the traditional view commonly held until two decades ago, a premarital contract that even addressed the contingency of the parties divorcing in the future (*e.g.*, by providing for a certain property division or levels of alimony or child support) was unenforceable in its entirety in all states as a contravention of the public policy favoring marriage:

> Some courts believed that such agreements encouraged divorce. The conventional wisdom was that if the husband were permitted to limit the amount of property and alimony the wife could receive at divorce, he would have an economic incentive to obtain a divorce. In addition, such agreements tended to limit the rights of an unsophisticated prospective spouse. Courts might have concluded that this spouse could not negotiate a fair contract with the other spouse because of differences in sophistication and bargaining power.

Oldham, *Premarital Contracts are Now Enforceable, Unless ...*, 21 Houston L.Rev. 757, 759–60 (1984) (footnotes omitted) [hereafter Oldham]; *see Palmer v. Palmer*, 26 Utah 31, 72 P. 3 (1903) (invalidating post-nuptial, pre-divorce property settlement agreement on public policy grounds). This rejection of all prenuptial agreements has been abandoned in most

---

**2.** Carleen does not challenge her $35,600 property award as inequitable or an abuse of discretion in the event we affirm the trial court's ruling that the entire premarital agreement is void and unenforceable.

jurisdictions, either by judicial pronouncement, *e.g., Brooks v. Brooks,* 733 P.2d 1044, 1048–51 & n. 16 (Alaska 1987) (and cases cited therein), or the enactment of legislation,[3] no doubt partially in response to the increasing frequency of divorce under "no fault" divorce laws and changes in the economic and social position of women. *See* Oldham, 21 Houston L.Rev. at 760–61; *Frey v. Frey,* 298 Md. 552, 471 A.2d 705, 709–10 (1984); *see also Osborne v. Osborne,* 384 Mass. 591, 428 N.E.2d 810, 814–16 (1981); *Gant v. Gant,* 329 S.E.2d 106, 112 (W.Va.1985).

Even in states where the traditional view of across-the-board unenforceability has been judicially or legislatively rejected, however, there are still several limits drawn from general contract law that are imposed on the enforceability of premarital contracts. These include requirements that they be voluntary, supported by consideration, made by competent parties, in compliance with any applicable statute of frauds, and consistent with public policy. Younger, *Perspectives on Antenuptial Agreements,* 40 Rutgers L.Rev. 1059, 1062 (1988) [hereafter Younger]; 1 *Valuation & Distribution of Marital Property* § 4.10[2] (McCahey ed. 1989). In addition, courts have measured prenuptial agreements against diverse standards of procedural and substantive "fairness," at the time of their execution and/or at the time enforcement is sought. Younger, 40 Rutgers L.Rev. at 1073–86; Oldham, 21 Houston L.Rev. at 766; *see generally* Annotation, *Premarital Agreement Terms,* 53 A.L.R.4th 161 (1987).

Although the Utah Supreme Court has never ruled directly on the validity of prenuptial agreements governing the disposition, upon divorce, of property owned by parties at the time of their marriage, it

recently pointed out in dictum that they are generally valid "so long as there is no fraud, coercion, or material nondisclosure." *Huck v. Huck,* 734 P.2d 417, 419 (Utah 1986).[4] This language was relied on in *Berman v. Berman,* 749 P.2d at 1273, as a ruling that prenuptial agreements pertaining to the treatment of property brought to the marriage if divorce eventually occurs are not *per se* invalid.[5] Because no fraud or duress had been established, the *Berman* court enforced a prenuptial agreement providing that all the parties' real and personal property was to be held after marriage as their separate property, concluding that the trial court erred in awarding the wife one-half the equity in a home owned by the husband when the agreement was executed.

The reasons for invalidating a prenuptial agreement enumerated in *Huck* and *Berman* are not necessarily an exhaustive listing of the grounds on which a Utah court could properly refuse enforcement. For example, no Utah appellate decision has yet addressed the issue of nonenforceability of a prenuptial agreement either because of unconscionability, explained at length in *Resource Mgmt. Co. v. Weston Ranch & Livestock Co.,* 706 P.2d 1028, 1040–47 (Utah 1985), or noncompliance with the statute of frauds in Utah Code Ann. § 25–5–4(3) (1989).

The public policy limitation imposed by the trial court in this case has been applied in several other jurisdictions as a limit on the enforceability of prenuptial agreements, even though they are not *per se* contrary to public policy because they were made in contemplation of divorce. For example, in a case apparently relied upon heavily by the trial court here, the California Supreme Court held that a prenuptial agreement violates the public policy favor-

---

3. *E.g.,* Uniform Premarital Agreement Act, 9B U.L.A. 371 (1987) (adopted in thirteen states).

4. In *Penrose v. Penrose,* 656 P.2d 1017 (Utah 1982), a unanimous court enforced a prenuptial agreement providing that each party's separate property was to remain as such even after marriage, but that the husband would pay from his separate estate for the support and maintenance of the wife.

5. The Utah Supreme Court also indicated in *Huck* that prenuptial agreements would be treated differently insofar as they purported to eliminate payment of child support or alimony. Enforcement of these provisions is left to the discretion of the trial court. *Huck,* 734 P.2d at 419; *Berman,* 749 P.2d at 1274.

ing and protecting marriage only insofar as its terms, evaluated objectively, "encourage or promote dissolution." *In re Marriage of Dawley,* 17 Cal.3d 342, 551 P.2d 323, 329, 131 Cal.Rptr. 3 (1976) (en banc). *Accord Spector v. Spector,* 23 Ariz.App. 131, 531 P.2d 176, 181 (1975) (agreements that "provided for or tended to induce divorce or separation" would be contrary to public policy); *Englund v. Englund,* 175 N.W.2d 461, 463 (Minn.1970) (prenuptial agreement enforceable as long as it does not encourage divorce); *Gross v. Gross,* 11 Ohio St.3d 99, 464 N.E.2d 500, 506 (1984) (prenuptial agreement providing for disposition of property is enforceable if, among other things, the terms do not "promote or encourage divorce or profiteering by divorce").

The Restatement standard employs a "reasonableness" factor: "A promise that tends unreasonably to encourage divorce or separation is unenforceable on grounds of public policy." Restatement (Second) of Contracts § 190(2) (1981). Other jurisdictions have expressly or implicitly adopted this standard as the public policy limitation on the enforceability of provisions in a premarital agreement that settle the parties' property rights upon divorce. *E.g., McHugh v. McHugh,* 181 Conn. 482, 436 A.2d 8, 12 (1980) (dictum citing Restatement and stating that "antenuptial agreements that promote, facilitate, or provide an incentive for separation or divorce are generally opposed to public policy and of dubious enforceability"); *Osborne v. Osborne,* 428 N.E.2d at 816 (prenuptial agreement may be unenforceable if it unreasonably encourages divorce).

■ Notwithstanding the relative ease with which parties to a deteriorated marriage can obtain a dissolution on grounds enumerated in Utah Code Ann. § 30–3–1(3) (1989), we believe the statutes regulating marriage and divorce still reflect that it is the public policy of this state to preserve marriage and disfavor dissolution. "When [the marriage] status is created the rights involved are not merely private, but they are also of public concern. The social system and welfare of the state having their

foundation in the family, the state is an interested party...." *Palmer v. Palmer,* 72 P. at 7. The public interest in stable, harmonious marriages was more recently expressed by our supreme court while examining a "reconciliation agreement" by which the parties settled and dismissed a prior divorce action: "The marriage itself and the obligations inherent in it are matters which it has always been recognized cannot be left entirely to private contract." *Mathie v. Mathie,* 12 Utah 2d 116, 363 P.2d 779, 784 (1961). We therefore adopt the Restatement view and hold that a promise in a prenuptial agreement regarding the disposition, upon divorce, of property brought to the marriage by the parties is unenforceable if it tends unreasonably to encourage divorce or separation.

■ Measuring the Neilsons' prenuptial agreement against this standard, we conclude that the promise contained in the last sentence of paragraph 9, quoted above, is unenforceable on public policy grounds because it unreasonably tends to encourage divorce. It explicitly provides that, upon divorce as a result of an action initiated by Alfred, Carleen is to receive half of his Texas Eastern Corporation stock. Because this is the result regardless of how long the marriage lasted, this term of the parties' agreement provides Carleen a $400,000 profit incentive to induce Alfred to seek dissolution of the marriage at the earliest possible date.

This promise has the same effect as the following prenuptial promise of a husband held unenforceable on public policy grounds in *In re Marriage of Noghrey,* 169 Cal.App.3d 326, 215 Cal.Rptr. 153 (1985): "I, Kambiz Noghrey, agree to settle on Farima Human, the house ... [i]n Sunnyvale, ... [a]nd $500,000.00 or one-half of my assets, whichever is greater, in the event of a divorce." The court concluded that, although this provision would not encourage the husband to pursue dissolution, "[s]uch is not the case with the wife. She, for her part, is encouraged by the very terms of the agreement to seek a dissolution and with all deliberate speed...." *Id.,* 215 Cal.Rptr. at 156. Similarly, the court

in *Matthews v. Matthews*, 2 N.C.App. 143, 162 S.E.2d 697 (1968), refused to enforce a husband's antenuptial promise to let his wife have all his property, separate or marital, if he ever left her. Such a promise violates public policy favoring marriage and the home, the court concluded, because "it would induce the wife to goad the husband into separating from her." *Id.*, 162 S.E.2d at 699.

The drafters of Restatement (Second) of Contracts § 190(2), which we adopt, also concluded that a spouse's expectation of receiving a large amount of money upon divorce could violate that section when they gave the following example:

A and B, who are about to be married, make an antenuptial agreement in which A promises that in case of divorce, he will settle $1,000,000 on B. A court may decide that, in view of the large sum promised, A's promise tends unreasonably to encourage divorce and is unenforceable on grounds of public policy.

*Id.* comment c, illustration 5.[6]

We hold that the trial court properly refused to enforce, on public policy grounds, Alfred's promise to deliver half of his Texas Eastern Corporation stock to Carleen if he initiated an action that led to divorce. However, we do not reach the same conclusion about the other promises in the agreement. We do not interpret Alfred's promise in paragraph 9 to transfer 5% of his stock to Carleen on the date of their marriage and a fraction of his stock on each anniversary as unreasonably encouraging divorce. On the contrary, this promise—like the provision in paragraph 9 limiting Carleen to the shares of stock he had already transferred to her if she initiated a divorce—clearly encourages her to remain married for at least nine years.

■ Although Carleen either ignored or never realized it, the prenuptial agreement at issue is not necessarily completely unenforceable just because part of it violates

public policy. *See, e.g., Zerbetz v. Alaska Energy Center*, 708 P.2d 1270, 1282 (Alaska 1985); *Tate v. Mountain States Tel. & Tel. Co.*, 647 P.2d 58 (Wyo.1982). Where the offending provision is separable from the rest of the contract, the nonoffending provisions are enforceable. *McClain's Estate v. McClain*, 133 Ind.App. 645, 183 N.E.2d 842, 845 (1962); *Hagen v. O'Connell, Goyak & Ball, P.C.*, 68 Or.App. 700, 683 P.2d 563 (1984); *see Pelton's Spudnuts, Inc. v. Doane*, 120 Utah 366, 234 P.2d 852, 855 (1951). According to Restatement (Second) of Contracts § 184(1) (1981), a court may enforce the valid parts of an agreement "in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange."

In this case, the enforceability of the Neilsons' premarital agreement was treated as an all-or-nothing proposition. Appellant has not contended, before this court or the trial court, that the agreement is partially enforceable even if one provision is contrary to public policy. We, therefore, do not address the separability issue and, instead, affirm the trial court's ruling that the Neilsons' agreement is unenforceable in its entirety. Because our resolution of this issue is dispositive, we need not reach the question of whether the agreement is unenforceable because of a failure of consideration.

## ATTORNEY FEES

■ Although paragraph 9 of the December 1987 decree entered by the trial court may be only an inartful denial of Carleen's request that Alfred pay her attorney fees, it nonetheless affirmatively orders Carleen to pay her attorneys $20,000 as reasonable attorney fees and court costs. On appeal, she protests this unorthodox approach to attorney compensation and asks us to reverse this part of the decree. She does not claim that the trial

---

6. In *Gross v. Gross*, 464 N.E.2d at 506, the Supreme Court of Ohio described a hypothetical prenuptial property agreement that would be unenforceable as violative of public policy because it encouraged or promoted "profiteering by divorce" as one "which provides a significant sum ... and after the lapse of an undue short period of time one of the parties abandons the marriage or otherwise disregards the marriage vows."

court's finding that she is capable of paying her own attorney fees incurred at trial is clearly erroneous or that the trial court abused its discretion by not ordering Alfred to pay them.

We agree with Carleen that the trial court acted improperly in ordering her to pay her attorneys $20,000 instead of merely denying her request for an order directing Alfred to pay her attorneys a reasonable fee. Under Utah Code Ann. § 78–51–41 (1987), compensation of an attorney for services rendered is a matter governed by the express or implied agreement with the client. That section creates an attorney's charging lien upon the client's cause of action or counterclaim, which attaches to' the proceeds of the judgment or verdict in the client's favor. *Id.* The statute applies to all causes of action, including those resulting in divorce. *Hampton v. Hampton,* 85 Utah 338, 39 P.2d 703, 706 (1935) (decided under identical predecessor statute). Generally, the statutory charging lien may not be foreclosed by way of the attorney's request for that relief in the original action; instead, counsel must bring a separate action against the client to determine the amount of the fee and foreclose the lien. *Midvale Motors, Inc. v. Saunders,* 21 Utah 2d 181, 442 P.2d 938, 941 (1968); *see Phillips v. Smith,* 768 P.2d 449, 450 n. 2 (Utah 1989). If counsel for Carleen had sought an order enforcing an attorney lien or directing that his client pay him, it would clearly have been improper for the court to grant that request in this action. Nor could Alfred properly request such an order on behalf of Carleen's counsel.

It appears, however, that no one requested the relief eventually afforded by paragraph 9 of the signed decree. A trial court has no authority to render a decision on issues not presented to it for determination. *Combe v. Warren's Family Drive– Inns, Inc.,* 680 P.2d 733, 736 (Utah 1984). "The trial court is not privileged to determine matters outside the issues of the case, and if [it] does, [its] findings will have no force or effect." *Id.* To the extent that paragraph 9 of the trial court's decree pur-

ports to order Carleen to pay her attorneys or provide her attorneys with a judgment against her in the amount of $20,000, it is erroneous. We therefore modify that paragraph of the decree so that it simply denies Carleen's request for an order directing Alfred to pay the attorney fees she reasonably incurred at the trial court level.

As so modified, the trial court's decree is affirmed. The parties are to bear their own costs and attorney fees incurred on appeal.

BENCH and GARFF, JJ., concur.