EPIC ASSOCIATES, 80–XX, a limited partnership; and Epic Mortgage, Inc., a corporation, Plaintiffs and Appellants,

v.

WASATCH BANK, a corporation; Nature's Estates & Associates, a corporation; Intermountain Precision-Bilt Homes, Inc., a corporation; Jonco Construction Company, a corporation; JRE Construction Company, a partnership; and Morris-Hansen-Liston, Inc., a corporation, Defendants and Respondents.

WASATCH BANK, a corporation; Nature's Estates & Associates, a corporation; Intermountain Precision-Bilt Homes, Inc., a corporation; Jonco Construction Company, a corporation; JRE Construction Company, a partnership; and Morris-Hansen-Liston, Inc., a corporation, Defendants and Appellant,

v.

EPIC ASSOCIATES, 80–XX, a limited partnership; and Epic Mortgage, Inc., a corporation, Plaintiffs and Respondents.

Nos. 19352, 20215.

Supreme Court of Utah.

Sept. 19, 1986.

Edward M. Garrett, Michael A. Katz, Salt Lake City, for plaintiffs and appellants.

S. Rex Lewis, John L. Valentine, Provo, for defendants and respondents.

HALL, Chief Justice:

Plaintiffs Epic Associates, 80–XX, and Epic Mortgage, Inc. ("Epic") appeal the denial of their requested relief to enjoin a trustee's sale of real property and to compel reconveyance of a trust deed. Defendant Wasatch Bank ("Bank") separately appeals a subsequent order of the trial court releasing an injunction bond after the record on appeal was filed in this Court.

The facts are not materially in dispute. Maple Tree Associates ("MTA"), a joint venture, planned to develop twenty-one acres of unimproved land in Orem, Utah, into seventy-one residential lots. The land was platted as Maple Tree Subdivision ("Subdivision").

MTA obtained a $1,000,000 loan from the Bank to finance the land development. The budget submitted to the Bank in connection with the loan application revealed that some $295,000 of the loan proceeds were to be used to purchase and erect six modular homes in the Subdivision to be used as sales models. In exchange for the loan, MTA executed and delivered a promissory note to the Bank. A trust deed covering the Subdivision was also executed and delivered to the Bank. The loan agreement contained the following provision for individual lot releases:

> Principal payments of not less than $11,000 per lot release at closing of each sale of lot at which time a partial release for subject lot sold shall be provided by the Bank.

No discussion was had nor any agreement reached concerning the release price of the lots on which model houses were erected, because it was not intended that those lots be offered for sale until all other lots were sold.

Model homes were erected on six of the lots, using funds from the Bank loan. Because of cash flow problems, MTA sold the six improved lots to Epic under a leaseback arrangement. Reid National Title Insurance Agency was retained to handle the closing. In order to properly disburse the sale proceeds and to secure a first lien position to Epic on each of the six lots, Ronald Reid, representing the title company, contacted the Bank by telephone to obtain a payoff figure and was referred to a secretary, Linda Reilly. While evidence of their conversation is somewhat in dispute, testimony at trial indicated the following: Reilly testified that Reid simply inquired about lot release prices in the Subdivision, without specifying any particular lots. He also did not disclose the fact that lot sales were pending or that any lots with model houses on them were involved. Whereupon, Reilly advised Reid that the lot release price was $11,000 per lot. Reid, on the other hand, testified that he identified the six lots in the Subdivision by number, but that he did not disclose that the lots he inquired about had model houses on them. Reid further testified that the general practice in the title insurance and banking industries was to honor a telephone quotation of a pay-off amount such that a closing agent could proceed to disburse funds in reliance thereupon. In this regard, Reilly testified that on at least one prior occasion, she quoted a payoff figure to Reid and subsequently honored the quotation by reconveying a trust deed upon tender by Reid of the quoted amount.

Sometime after this conversation with Reilly, Reid proceeded to close the transaction without any further contact with the Bank, and he tendered a $66,000 check to the Bank as a payoff on the lots. On the preceding day, the Bank discovered that the six lots upon which the model houses had been erected had been sold. When the $66,000 check arrived at the Bank, it was returned with a letter stating that the Bank had disbursed a total of $361,000 on the six lots and had not yet established the payoff amounts for the lots. No subsequent action was taken by either party to establish a payoff amount for the six lots.

The Bank claims it learned that title to the six lots had actually been transferred after obtaining a foreclosure report sought in connection with the recording of a notice

of default on the $1,000,000 loan. When the Bank proceeded to exercise its power of sale under its deed of trust, Epic commenced this action to restrain the sale. A preliminary injunction was issued after Epic filed a bond in the amount of $100,-000. Epic's claims against the Bank were tried without a jury.

Based upon the foregoing evidence, the trial court found:

> [T]hat for the customs in the industry to have been observed and the bank held on its telephone quote, the closing agent, Reid National Title, was obligated to ask for a quote as to improved lots or lots with model homes on them, since the loan agreement only placed a bottom limit on the amount to be tendered for release, and he is chargeable with knowledge of the additional added value which had gone into those lots, and should have structured his request for a payoff consistent with the circumstances of the particular lots. Had he done that, the Court is of the opinion that the quote given by the bank would be binding, but not having clarified the particular improvement the release was sought for, he could not claim the minimum figure quoted by the bank. This conclusion is consistent with Mr. Reid's testimony that he, at the most, identified the lot numbers, but he did not testify that he talked of the improved lots when he got the quote from Mrs. Reilly.

The court thereupon entered an order dissolving the preliminary injunction and permitting the trustee's sale to go forward. Epic filed a notice of appeal and posted a supersedeas bond fixed by the court in the amount of $250,000. Thereupon, the court reinstated the preliminary injunction pending resolution of this appeal. Nearly one year after the record on appeal was filed in this Court, Epic sought release of the $100,000 injunction bond and over the objection of the Bank, the trial court released it.

Epic's first point on appeal is a challenge to the sufficiency of the evidence supporting the trial court's conclusion that the Bank was not bound by its quote of a lot release figure.

When faced with a challenge to the sufficiency of the evidence, this Court is obliged to view the evidence and all reasonable inferences to be drawn therefrom in the light most favorable to the findings of the trial court.[1] Application of this standard of review in the instant case requires the judgment of the trial court to remain undisturbed.

It is clear from the evidence that a custom prevails in the industry that telephonic payoff quotations are honored. The reasonable inference to be drawn therefrom is that the request for a payoff need be made in sufficient detail and with such formality that the parties have a meeting of the minds on what is being requested and what commitment is expected. Viewing the evidence in the light most favorable to the judgment of the trial court, a sufficient request simply was not made in this case. No formal request was made for a payoff on any specific lots; the payoff information requested was directed to the Subdivision lots generally; and no mention was made of a sale being closed or that the lots inquired about had houses erected on them. In addition, a sizeable portion of the funds loaned by the Bank were used to purchase and erect the six model houses which were to be used for demonstration purposes only and were not to be sold until after the other lots in the Subdivision were sold.

Epic's second point on appeal is that the Bank is estopped from denying its agreement to release the six lots in question. However, the facts of this case do not meet the requisite elements of equitable estoppel.[2] The Bank made no false representations, nor did it conceal any material facts. Also, it was not reasonable and prudent for Epic to rely upon the quot-

---

1. *Car Doctor, Inc. v. Belmont,* 635 P.2d 82 (Utah 1981).

2. 31 C.J.S. *Estoppel* § 67 (1964).

ed lot release figure as applying to lots improved by the erection of houses on them with funds loaned by the Bank. On the contrary, Epic had a duty to make clear its request for a payoff figure on lots with houses on them. There was a clear lack of communication between the parties, and the trial court did not err in concluding that Epic did not make out a case of estoppel.

Epic's remaining point on appeal is that the loan agreement between MTA and the Bank constitutes a binding commitment to reconvey upon tender of $11,000 per lot, irrespective of whether the lot payoff quote was binding. However, this contention fails by virtue of the plain, unambiguous terms of the loan agreement[3] as it pertains to the release of lots. The provision stating "payments of not less than $11,-000.00 per lot release" clearly establishes only the minimum payment required. Thus, there was no binding agreement that any and all lots would be released for a payment of $11,000 each. Therefore, the Bank was entitled to receive a sum in excess of $11,000 for the release of a lot with a house erected on it.

We now turn to the separate appeal filed by the Bank. It is the Bank's contention that the trial court undertook to modify the amount of the supersedeas bond by releasing the injunction bond after notice of appeal had been filed and after the record on appeal had been filed in this Court; therefore, its actions were void for lack of jurisdiction. The record before us does not support that contention.

The Bank erroneously characterizes the injunction bond as being a part of the supersedeas bond. After the notice of appeal was filed, but prior to the time the record on appeal was filed in this Court,[4] the trial court fixed the supersedeas bond in the amount of $250,000. No appeal was taken therefrom, and no mention was made of the injunction bond.

The ruling of the court complained of recites that the supersedeas bond was fixed in the amount of $250,000, that a bond in that amount was filed, and that because it was the court's prior intention to release the $100,000 injunction bond, it proceeded to do so. It is reasonable to infer therefrom that the supersedeas bond was fixed in the amount of $250,000, that the sum fixed was reasonable (absent an appeal), and that it was separate and apart from, and not fixed in addition to, the prior existing $100,000 injunction bond.

Also, the trial court was not deprived of jurisdiction to authority to release the injunction bond, notwithstanding the fact that an appeal had been filed, because the issue pertaining to the disposition of the injunction bond was clearly collateral to and not a part of any of the issues on appeal.[5]

Affirmed. Each of the parties to bear their own costs on appeal.

STEWART, HOWE, DURHAM, and ZIMMERMAN, JJ., concur.

---

**3.** *See supra* p. 1370.

**4.** The filing of this bond was in compliance with former Utah Rules of Civil Procedure 73(d) and 73(e) (U.C.A., 1953 (Repl. Vol. 9B, 1977 ed.)), repealed with the adoption of the Utah Rules of Appellate Procedure, effective January 1, 1985. For present provisions, *see* Utah R.App.P. 6 and 8(b), (U.C.A., 1953 (Repl.Vol. 9B, 1977 ed., Supp.1986)).

**5.** 4 Am.Jur.2d *Appeal and Error* § 355; *see Swasey v. Rocky Point Ditch Co.,* 649 P.2d 1 (Utah 1982); *Warren v. Warren,* 642 P.2d 385 (Utah 1982).