Bruno D'ASTON, Plaintiff
and Appellee,

v.

Dorothy D'ASTON, et al., Defendants
and Appellants.

No. 890050–CA.

Court of Appeals of Utah.

June 14, 1990.

Rehearing Denied Aug. 30, 1990.

Brian C. Harrison (argued), Harris, Carter & Harrison, Provo, for defendants and appellants.

S. Rex Lewis (argued), Leslie W. Slaugh, Howard, Lewis & Peterson, Provo, for plaintiff and appellee.

OPINION

Before BILLINGS, GARFF and ORME, JJ.

BILLINGS, Judge:

Appellant, Dorothy D'Aston ("Wife"), appeals from a divorce decree entered by the district court, principally claiming the court erred in failing to distribute the parties'

property pursuant to a postnuptial agreement.

On appeal, Bruno D'Aston ("Husband") responded that since Wife was in contempt of the trial court and was avoiding court process, this court should not consider her appeal on the merits. We agreed with Husband and ordered Wife to submit herself to the process of the trial court within 30 days or we would dismiss her appeal. *See D'Aston v. D'Aston,* 790 P.2d 590 (Utah Ct.App.1990). Wife gave us notice of her compliance with our order on May 4, 1990, and therefore we address the merits of her appeal in this opinion.

We agree with Wife's contention that the trial court erred in failing to distribute the parties' property pursuant to their postnuptial agreement and therefore reverse and remand.

Husband and Wife divorced on December 15, 1988, after a 35-year marriage. In 1973, Husband asked Wife to enter into a written property agreement, which had been prepared by his attorney. The agreement was executed by both parties in 1973, then notarized and recorded in the State of California in 1975.

Under the 1973 agreement, Wife received two parcels of real estate and cash. Husband received all real property outside the United States; personal property in his possession, which included $1 million in coins and a collection of antique cars; and all domestic and foreign patents and patent rights. The agreement also provided that all property acquired by either party in his/her own name would be the separate property of that person. Finally, the agreement provided that the parties would execute documents to implement the agreement, and that each had the advice of counsel, had read the agreement, and had not signed the agreement under duress, fraud or undue influence. Shortly after the agreement was signed, the parties conveyed the property as provided in the agreement.

On May 2, 1986, Husband filed for divorce. Husband claimed that much of the tangible personal property given to him under the 1973 agreement had been stolen on April 30, 1986, the day Wife had asked him to leave their home. On July 31, 1986, Husband's California attorney, who had drafted the 1973 agreement, sent a letter to Wife's Utah attorney which stated the 1973 agreement was in full force and effect.

Both parties at trial acknowledged they executed the 1973 agreement voluntarily and did not execute it under duress, fraud or undue influence. However, at trial, Husband claimed the 1973 agreement should not control the disposition of the parties' property in this divorce action because the agreement was entered into only to protect the couple's assets from possible creditors in pending litigation, not to distribute property in the event of divorce. Wife at trial claimed she had no knowledge of the alleged pending litigation and assumed the 1973 agreement was to control for all purposes, including the possibility of divorce.

The trial court held the 1973 agreement was not intended to control in the event of divorce, and thus, equitably divided all of the parties' property and awarded no alimony to either party. Wife appeals, claiming that (1) the trial court erred in dividing the parties' separate property in this divorce action contrary to the terms of the 1973 agreement, (2) the trial court erred in denying Wife alimony, and (3) the conduct of the trial judge constituted judicial bias.

## VALIDITY OF POSTNUPTIAL AGREEMENTS

 In Utah, prenuptial agreements are enforceable as long as there is no fraud, coercion or material nondisclosure.[1] Utah's courts have not yet considered the enforceability of postnuptial agreements not in contemplation of divorce. However, other jurisdictions review postnuptial prop-

---

1. *See Huck v. Huck,* 734 P.2d 417, 419 (Utah 1986) ("it should be noted that in general, prenuptial agreements concerning the disposition of property owned by the parties at the time of their marriage are valid so long as there is no fraud, coercion or material nondisclosure"); *Berman v. Berman,* 749 P.2d 1271, 1273 (Utah Ct.App.1988).

erty agreements under the same standards as those applied to prenuptial agreements.[2]

We agree with the majority of our neighboring jurisdictions and thus hold that a postnuptial agreement is enforceable in Utah absent fraud, coercion, or material nondisclosure.[3]

Neither Husband nor Wife assert that the 1973 property agreement was entered into as a result of fraud or coercion nor do they contend that there was material non-disclosure of the parties' assets. Thus, this postnuptial agreement should be enforced pursuant to its terms.

Our conclusion, however, does not resolve this controversy as Husband and Wife disagree as to the meaning and scope of the 1973 postnuptial property agreement. Wife contends the agreement by its unambiguous terms applies in the event of divorce. Husband argues that it was executed merely to protect the parties' property from creditors and was not intended to control a distribution of the parties' property in the event of divorce. Thus, we must determine what the parties intended when they entered into this 1973 agreement.

Utah courts have applied general contract principles when interpreting prenuptial agreements. *See Berman v. Berman*, 749 P.2d 1271, 1273 (Utah Ct.App.1988) (A prenuptial agreement should be treated like any other contract. "In interpreting contracts, the principal concern is to determine what the parties intended by what they said."). This approach is consistent with other jurisdictions' treatment of postnuptial agreements.[4]

■■■ Thus, in order to resolve Husband and Wife's disagreement as to the scope and meaning of this postnuptial agreement, we apply normal rules of contract construction. The core principle is that in construing this contract, we first look to the four corners of the agreement to determine the

**2.** *See In re Estate of Harber*, 104 Ariz. 79, 449 P.2d 7, 16 (1969) (en banc) ("[M]arital partners may in Arizona validly divide their property presently and prospectively by a post-nuptial agreement, even without its being incident to a contemplated separation or divorce," provided it is fair and equitable and is free from fraud, coercion or undue influence and that "wife acted with full knowledge of the property involved and her rights therein."); *In re Estate of Lewin*, 42 Colo.App. 129, 595 P.2d 1055, 1057 (1979) ("Nuptial agreements, whether executed before or after the marriage, are enforceable in Colorado [and a] nuptial agreement will be upheld unless the person attacking it proves fraud, concealment, or failure to disclose material information."). *See also In re Estate of Loughmiller*, 229 Kan. 584, 629 P.2d 156, 162 (1981) (postnuptial agreements, fairly and understandingly made, are enforceable); *In re Estate of Gab*, 364 N.W.2d 924, 925–26 (S.D.1985) (postnuptial agreement to protect inheritance rights valid if property fairly disclosed and spouse enters into freely and for good consideration); *Button v. Button*, 131 Wis.2d 84, 388 N.W.2d 546, 550–51 (1986) (postnuptial agreement must meet requirements of fair and reasonable disclosure, entered into voluntarily and freely, and substantive provisions fair to each spouse). *But cf. Ching v. Ching*, 751 P.2d 93, 97 (Haw.Ct.App. 1988) (general rule that property agreements should be enforced absent fraud or unconscionability applies to prenuptial, but not to postnuptial, agreements).

**3.** This postnuptial agreement was entered into in California. Under California law, married couples may contract to change the separate or community status of their property. Cal. Civil Code § 5103 (1990); *In re Marriage of Dawley*, 17 Cal.3d 342, 551 P.2d 323, 328 n. 6, 131 Cal. Rptr. 3 (1976). Further, married couples may enter into contracts with each other concerning their property rights as though unmarried, subject to rules controlling actions of persons occupying confidential relations with each other. *Haseltine v. Haseltine*, 203 Cal.App.2d 48, 21 Cal.Rptr. 238, 244 (1962); *In re Estate of Marsh*, 151 Cal.App.2d 356, 311 P.2d 596, 599 (1957). California law is in harmony with Utah law on the issue of the enforceability and interpretation of postnuptial agreements and thus we need not resolve the issue of which state's law should apply.

**4.** *See Matlock v. Matlock*, 223 Kan. 679, 576 P.2d 629, 633 (1978) ("[C]ontracts, made either before or after marriage, the purpose of which is to fix property rights between a husband and wife, are to be liberally interpreted to carry out the intentions of the makers and to uphold such contracts where they are fairly and understandably made, are just and equitable in their provisions, and are not obtained by fraud or overreaching."); *Roberts v. Roberts*, 381 So.2d 1333, 1335 (Miss.1980) ("The rules applicable to the construction of written contracts in general are to be applied in construing a postnuptial agreement."); *Bosone v. Bosone*, 53 Wash.App. 614, 768 P.2d 1022, 1024–25 (1989) ("a community property agreement is a contract, and effect should be given to the clearly expressed intent of the parties").

parties' intentions. *See Neilson v. Neilson*, 780 P.2d 1264, 1267 (Utah Ct.App. 1989); *see also Ron Case Roofing & Asphalt Paving Co. v. Blomquist*, 773 P.2d 1382, 1385 (Utah 1989); *LDS Hosp. v. Capitol Life Ins. Co.*, 765 P.2d 857, 858 (Utah 1988); *Buehner Block Co. v. UWC Assocs.*, 752 P.2d 892, 895 (Utah 1988).

 The relevant provisions of the 1973 agreement denoting its scope and application state, with our emphasis:

1. The husband does transfer, bargain, convey and quitclaim to the wife all of his right, title and interest, if any there be, in and to the following:

(a) The real property at 14211 Skyline Drive, Hacienda Heights, California and in and to all buildings, appurtenances and fixtures thereon.

(b) The real property at 230 South Ninth Avenue, City of Industry, California, including all buildings, appurtenances and fixtures thereon, and any and all oil and mineral rights thereto.

(c) Any and all cash in bank accounts located in the State of California.

2. The wife transfers, bargains, conveys and quitclaims to the husband all of her right, title and interest in and to real property located outside of the United States of America, and in and to all personal property in the possession of the husband, or subject to his control in the United States, Europe or elsewhere in the world, and in and to all patents or patent rights under the laws of the United States, United Kingdom or any commonwealth thereof, Switzerland, Japan or other countries. The provisions of this paragraph apply to all property described herein, whether presently owned or in existence or to be acquired or created in the future.

3. Hereafter, and until this agreement is modified in writing attached hereto, all property, real, personal and mixed, acquired by either party in his or her sole name, from whatever source derived and wherever situated, shall be the sole and separate property of such person, *notwithstanding any law, statute or court decision giving presumptive effect to the status of marriage;* and such property shall be free of all claims, demand or liens of the other, direct or indirect, and however derived.

This postnuptial agreement provides that Husband and Wife's property will be divided and the division will control for all purposes. The agreement was entered into in a community property state and the contractual language unambiguously and specifically refers to rebutting the presumption that all property acquired during the marriage is community property.

The trial court did not expressly conclude that the 1973 property agreement was ambiguous, but nevertheless proceeded to take extrinsic evidence[5] as to the parties' intentions and, based upon this controverted extrinsic evidence, concluded that the parties did not intend the 1973 agreement to apply in the event of divorce.

The threshold determination of whether a writing is ambiguous is a question of law, *Buehner Block Co.*, 752 P.2d at 895; *Faulkner v. Farnsworth*, 665 P.2d 1292, 1293 (Utah 1983); *Whitehouse v. Whitehouse*, 790 P.2d 57, 60–61 (Ct.App.1990), and thus we review a trial court's determination under a correction-of-error standard, according no particular deference to the trial court. *Id.; see also Seashores Inc. v. Hancey*, 738 P.2d 645, 647 (Utah Ct.App. 1987).

We find this postnuptial agreement unambiguously provides that it will apply to a disposition of the parties' property in the event of divorce.[6] Thus, we reverse the

---

5. "Resort to extrinsic evidence of the parties' intent is permissible only if the contract document appears to express the parties' agreement incompletely or if it is ambiguous in expressing that agreement." *Neilson*, 780 P.2d at 1267; *see also Anderson v. Gardner*, 647 P.2d 3, 4 (Utah 1982) (only when an ambiguity exists which cannot be reconciled by an objective and reasonable interpretation of the agreement as a whole should the court resort to evidence beyond the four corners of the agreement).

6. Husband argues on appeal that even if we find the trial court erred when it found the 1973 agreement was not intended to apply in the event of a divorce, the error was harmless be-

trial court's contrary ruling which was based upon extrinsic evidence as to what Husband and Wife intended by their 1973 agreement.

In summary, we reverse the trial court's property distribution and remand for enforcement of the 1973 postnuptial property agreement and then the division of the remaining property, if any, not controlled by it. Because we reverse and remand the property division, we also reverse and remand on the issue of alimony. We believe our decision necessitates the reconsideration of whether either Husband or Wife should receive alimony.[7]

GARFF and ORME, JJ., concur.

cause of the broad equitable powers trial courts possess in domestic matters. *See Colman v. Colman,* 743 P.2d 782, 789 (Utah Ct.App.1987). However, even if a trial court has the equitable power to disregard an otherwise enforceable postnuptial property settlement agreement and to distribute the separate property of the spouses, the circumstances must be unique and compelling to justify the application of such an exception. The trial court made no findings to delineate what it found as compelling circumstances to justify such an action and we find none.

In support of his argument, Husband claims that Utah courts have distributed premarital, gift or inheritance property of one spouse to the other spouse. *See Noble v. Noble,* 761 P.2d 1369, 1373 (Utah 1988); *Burke v. Burke,* 733 P.2d 133, 135 (Utah 1987); *Naranjo v. Naranjo,* 751 P.2d 1144, 1147–48 (Utah Ct.App.1988); *Peterson v. Peterson,* 748 P.2d 593, 595–96 (Utah Ct.App. 1988). We find these cases clearly distinguishable as they do not involve an otherwise enforceable prenuptial or postnuptial agreement.

Husband also argues that Utah courts may refuse to apply property settlement agreements in a divorce action. *See Klein v. Klein,* 544 P.2d 472, 476 (Utah 1975); *Colman v. Colman,* 743 P.2d 782, 789 (Utah Ct.App.1987). Again, these cases do not deal with postnuptial property settlement agreements not in contemplation of divorce and are otherwise factually distinguishable.

7. We need not consider the issue of whether the trial court was biased against Wife as we have reversed the trial court's property distribution on other grounds.