**Bruno D'ASTON, Plaintiff, Appellee, and Cross–Appellant,**

v.

**Eryck ASTON; Dorothy D'Aston; and Lisa Aston, Defendants, Appellants, and Cross–Appellees.**

No. 900223–CA.

Court of Appeals of Utah.

Dec. 2, 1992.

---

Keith W. Meade (argued), Cohne, Rappaport & Segal, Salt Lake City, for Erick Aston.

S. Rex Lewis (argued), Kevin J. Sutterfield and Leslie W. Slaugh, Howard, Lewis & Petersen, Provo, for Bruno Aston.

Before BILLINGS, JACKSON and ORME, JJ.

## OPINION

ORME, Judge:

Appellant Eryck B. Aston appeals from an order and decree entered by the trial court awarding appellee, Bruno D'Aston, certain personal property seized from Eryck pursuant to a Writ of Execution and Assistance. On appeal, Eryck seeks an order quashing the writ, vacating the trial court's order and decree issued pursuant to the writ, and directing that all property seized from Eryck be redelivered to him. Eryck also claims the trial court erroneously awarded Bruno attorney fees as an item of costs. Bruno cross-appeals contending the appeal is moot, a contention we summarily reject. Except for the cost issue, we affirm.

## FACTS

In May of 1986, Bruno D'Aston filed a complaint against his wife and children seeking (1) a divorce from his wife, Dorothy D'Aston, (2) distribution of marital property between Bruno and Dorothy, and (3) a determination of the rights of his two adult children, Eryck and Lisa, to certain property. In the complaint, Bruno alleged that Eryck, in collusion with Dorothy, had stolen coins and other property from his car and motor home on April 30, 1986. Bruno claimed many of the allegedly stolen coins and silver bullion described in his complaint were in his possession by consignment from two individuals, Michael Graham and Al Schaefer. Accordingly, he sought an order compelling Dorothy and the children to return the allegedly stolen property.[1]

Prior to the trial of this matter in April of 1988, all parties to the action, including Eryck, were represented by counsel and participated in discovery. At trial, both Dorothy and Eryck testified regarding the coins, stamps, silver, gold bullion, and other valuable items that Bruno claimed were stolen. Both denied having taken Bruno's property. Bruno also presented the testimony of several witnesses who claimed they had seen some of the coins alleged to have been stolen from Bruno in the possession of Dorothy and Eryck, and offered for sale by them at coin shows subsequent to the date they were allegedly stolen. In turn, Eryck and Dorothy presented testimony of witnesses who claimed they saw some of the allegedly stolen coins in Bruno's possession and offered by him for sale at coin shows after the date he claimed they were stolen.

Eryck testified as to the contents of his own coin collection, introduced a list of his own inventory of coins, and compared it to the list of stolen inventory which Bruno had prepared and provided to the police shortly after the alleged theft. In the same manner, Bruno compared his list of stolen inventory, hereinafter referred to as the police report inventory, to Eryck's inventory list, claiming several items listed in Eryck's inventory as his own. During trial, the ownership of several coins appearing on both Bruno's and Eryck's lists was disputed, and both parties presented evidence and testimony as to the ownership of these coins.

Bruno claimed at trial that many of the coins and much of the silver bullion allegedly stolen from his motor home were consigned to him by two coin dealers: Michael

---

1. Shortly after Bruno reported the coins and other property stolen, he prepared for the police, from memory, a detailed list of many of the items missing. Included among this property were various coins, bullion and other personalty, such as camera lenses, carrying cases and other optical equipment.

Graham and Al Schaefer. Bruno presented evidence and the testimony of several witnesses verifying both consignments.

In December of 1988, the trial court entered its initial decree, which included a small award of personal property to Eryck, as well as a divorce with comprehensive property distribution as between Bruno and Dorothy. Pursuant to the decree, Bruno was awarded a 70% ownership interest in the allegedly stolen coins and other property, and Dorothy was awarded the remaining 30%. Bruno was also awarded possession of the coins he claimed to have held on consignment. The decree stated that if any of the coins and other property alleged to have been stolen from Bruno were found in possession of any of the parties to the action, it would be considered contempt of court.

Dorothy appealed from the initial decree claiming the trial court, in distributing the marital property between her and Bruno, failed to apply the provisions of a postnuptial agreement entered into by Dorothy and Bruno in 1973. Although the decree implicitly determined that Eryck was entitled to no interest in the coins at issue in that proceeding, he did not appeal.

In April of 1989, the trial court issued an order to Eryck directing him not to transfer, dispose of, or in any way interfere with any of the personal property described in the decree. Also in April of 1989, Bruno obtained a Writ of Execution and Assistance to seize the allegedly stolen property if it was found.[2] On April 29, 1989, pursuant to the writ, constables entered Eryck's place of business and seized items matching those described in the police report inventory and other exhibits attached to the initial decree. The items seized included silver dollars, bullion and collectable coins. The constables made a detailed inventory list of the items seized, which list was filed with the court.

The trial court then issued an Order to Show Cause ordering Eryck to show why he should not be held in contempt of court since coins and other items awarded to Bruno and/or Dorothy by the initial decree and described in several exhibits attached to the decree were found in Eryck's possession. Eryck moved to quash the writ and to have the property returned to him, and the trial court denied the motion. Following numerous objections and motions concerning the writ, the trial court conducted an evidentiary hearing in order to determine ownership of the coins and other property seized from Eryck and to determine whether the items seized pursuant to the writ were the same coins and other personalty that Bruno had reported stolen prior to the initial proceeding.[3]

At the hearing, which lasted three days, both Eryck and Bruno presented evidence as to the ownership of various coins, silver bullion, and other personal property. Eryck challenged Bruno's claim that certain coins had been consigned to him by Michael Graham, doing business as "1841," and sought to introduce the deposition of Michael Graham wherein he testified that he had not consigned coins to Bruno. The trial court concluded that since the issue as to who owned the consigned coins had been decided in the proceeding which culminated in the initial decree, no evidence would be heard on the consignment issue. Accordingly, the trial court excluded the deposition as substantive evidence, considering it only as impeachment of Bruno's credibility.

In its Memorandum Decision, growing out of the hearing on the writ, the trial court found in favor of Bruno with respect to a portion of the seized property. The trial court found that (1) coins matching the description of those that Bruno claimed

**2.** The Writ of Execution and Assistance directed the constable to "take ... all property described in the exhibits attached to the Decree wherever it may be located and hold it until further order of the court."

**3.** According to the pre-trial order concerning the hearing on the writ, neither Bruno nor Eryck disputed the jurisdiction of the court to hear the matter. The pre-trial order also listed as an issue of law to be decided at the hearing the question of whether the decree, issued in December of 1988, constituted a judicial determination of ownership of the property set forth on the exhibits attached to the decree.

had been stolen unexplainedly appeared in Eryck's coin shop, (2) Eryck did not adequately explain why he had coins identical to Bruno's missing coins, (3) Eryck had sold many of the stolen coins to finance recent expensive purchases, and (4) the coins found in Eryck's coin shop that were identical to those reported stolen by Bruno were taken by Eryck.

In its ensuing Order and Decree, the court concluded that Bruno was the owner of certain coins bearing an "A" stamp,[4] and that Bruno was also the owner of the items found in Eryck's coin shop which matched those items included on the police report inventory. The court also concluded that Bruno should receive the items which matched the list of consignment items awarded to Bruno in the initial decree. Eryck was awarded all items not expressly included in either of these lists. The court also awarded Bruno costs and certain attorney fees.

Thereafter, in June of 1990, this court decided Dorothy's appeal from the initial decree. The court handed down a narrowly worded reversal of the trial court's distribution of marital property as between Bruno and Dorothy in the initial proceeding, and remanded the case for application of the 1973 post-nuptial agreement. *See D'Aston v. D'Aston*, 808 P.2d 111 (Utah App.1990).

In the instant appeal, Eryck now seeks an order quashing the Writ of Execution and Assistance, and vacating the trial court's Order and Decree issued in connection with the hearing on the writ, claiming this court's reversal renders the writ and all subsequent proceedings void. Related to this general claim, Eryck raises a number of subsidiary arguments which we consider in turn.

## I. ERYCK'S PRIMARY CLAIMS

Eryck's first two arguments are closely related. First, Eryck claims this court's reversal of the initial decree renders void the Writ of Execution and Assistance. Second, Eryck argues he was denied a full and fair hearing on the issue of ownership of the consigned coins because of the trial court's application of the doctrine of res judicata by reason of the now-reversed initial decree. The success of each argument turns on whether this court's partial reversal of the initial decree at Dorothy's behest destroyed the "finality" of the initial judgment as it pertained to Eryck. Before addressing the ultimate issue of finality as related to these two issues, we first review the general criteria necessary for a valid writ of execution and for application of res judicata.

### A. Validity of Writ of Execution

■ The party in whose favor a judgment was rendered has a clear right to have the judgment enforced. *Ketchum Coal Co. v. Christensen*, 48 Utah 214, 221, 159 P. 541, 543 (1916); *Ketchum Coal Co. v. District Court*, 48 Utah 342, 350, 159 P. 737, 740 (1916). Rule 69(a) of the Utah Rules of Civil Procedure provides that "[p]rocess to enforce a judgment shall be by writ of execution unless the court otherwise directs ..." *See Belnap v. Blain*, 575 P.2d 696, 700 (Utah 1978). Since the initial judgment in this case awarded majority ownership in the coins at issue and other property to Bruno, he had a clear right to enforce the judgment by executing on the property awarded to him wherever it was found. It is undisputed that a writ of execution may only be issued on a "final" judgment, and a writ of execution issued on a judgment which has been reversed or set aside is of no effect. *See generally,* 30 Am.Jur.2d *Executions* § 12 (1967).

On appeal, Eryck makes no argument concerning the technical validity of the writ. Rather, Eryck contends this court's reversal of the initial decree as between Bruno and Dorothy destroyed the finality of the initial judgment, thereby invalidating the writ and nullifying the evidentiary hearing conducted pursuant to the writ. Thus, if the initial decree is properly regarded as final as to Eryck, notwithstand-

---

**4.** Bruno consistently testified throughout the initial proceeding and the hearing on the writ that on many of his rare coins he had stamped the rim above the head with the letter "A."

ing this court's reversal in the prior appeal brought by Dorothy, Eryck's attack on the validity of the writ and related proceedings fails.

### B. Application of Res Judicata

Eryck also contends he was denied a full and fair hearing because the trial court incorrectly applied the doctrine of res judicata in its refusal to hear evidence on the issue of ownership of the consigned property, erroneously concluding the matter had been decided in the initial proceeding.

At the hearing on the writ, the trial court, apparently relying on the doctrine of res judicata, explained that the evidence and issues it could consider were limited by the initial decree, stating:

> And the court will hear no testimony on the issue of whether or not the consigned coins are the property of the plaintiff as that issue was decided by [the trial court in the initial proceeding].

When Eryck sought to introduce Michael Graham's deposition regarding coins and silver bullion Bruno claimed to have obtained from Michael Graham on consignment, the trial court excluded the evidence for the purpose offered, limiting its use to the impeachment of Bruno's credibility. The trial court also excluded evidence regarding a second consignment of coins received by Bruno from Al Schaefer on the ground that the issue had been determined in the initial proceeding. The court ultimately awarded Bruno only the coins and other property that had been awarded to him by the initial decree, including the coins and bullion he had taken on consignment.

"When there has been an adjudication, it becomes res judicata as to those issues which were either tried and determined, or upon all issues which the party had a fair opportunity to present and have determined in the other proceeding." *Throckmorton v. Throckmorton*, 767 P.2d 121, 123 (Utah App.1988) (quoting *Jacobsen v. Jacobsen*, 703 P.2d 303, 305 (Utah 1985)). In order for a claim to be barred by res judicata, both the prior claim and the current claim must meet three requirements: (1) both actions [5] must involve the same parties, their privies, or assignees; (2) the claim that is asserted to be barred must have been presented or be such that it could have been presented in the first case; and (3) the first suit must have resulted in a final judgment on the merits by a court of competent jurisdiction. *Fitzgerald v. Corbett*, 793 P.2d 356, 359 (Utah 1990). *See also Smith v. Smith*, 793 P.2d 407, 409 (Utah App.1990) (claim preclusion, a branch of the doctrine of res judicata, bars relitigation of claim that has previously been fully litigated between the same parties, or that should have been raised in the prior action but was not).

In the instant case, the first two requirements clearly have been met. First, both proceedings involved the same parties, Bruno and Eryck. Second, the record indicates the claim presented at the hearing on the writ—whether Bruno was entitled to possession of certain coins and other property he claimed to have obtained on consignment—was litigated and decided in the initial proceeding. With respect to the third requirement, we consider in the next section whether this court's reversal of the initial decree destroyed the finality of the initial judgment as to all parties to the

---

**5.** We note that most cases discussing res judicata and its application involve two separate actions. However, consistent with the parties' approach to this issue, we consider the post-judgment proceedings, i.e., Eryck's challenge to the writ and ensuing evidentiary hearing, as in the nature of a second "action" for purposes of res judicata analysis. *See generally, Church v. Meadow Springs Ranch Corp., Inc.*, 659 P.2d 1045, 1048 n. 1 (Utah 1983) ("the principle [of res judicata] is ... applicable to a defense which might have been but was not asserted in connection with an earlier proceeding (which terminat-

ed in a final judgment) in what is essentially a single and continuing controversy over the appropriate relief to give for a single wrong or closely related group of wrongs.") *Cf. Bradshaw v. Kershaw*, 627 P.2d 528, 531 (Utah 1981) (principle of res judicata applicable to successive proceedings involved in a contempt case); *Stumph v. Church*, 740 P.2d 820, 822 n. 1 (Utah App.1987) (although normally, partial judgment on only one phase of severed action does not result in application of res judicata, where partial judgment becomes final, res judicata may be invoked, where appropriate).

initial proceeding. If the finality requirement for res judicata is met, it follows that the trial court correctly concluded the ownership of the consigned coins was barred by the doctrine of res judicata. Accordingly, we now consider the effect of our prior reversal upon the finality of the initial decree as concerns Eryck.

## C. Finality of Initial Judgment

Against this background, our decision on both the validity of the writ and the applicability of the doctrine of res judicata during hearing on the writ comes to turn entirely on Eryck's argument that the initial decree may not be regarded as final because it was later reversed by this court.

■ Bruno, Dorothy, Eryck and Lisa were all parties in this action, and all participated in the prejudgment phase of the proceeding. The ensuing decree effectuated a divorce between Bruno and Dorothy, allocated property between them, and implicitly determined, in awarding all of the coins and related items at issue to Bruno and Dorothy, that Eryck had no right to such property. In addition to distributing property between Bruno and Dorothy, the trial court also made a specific award of property to Eryck.[6] Clearly, then, the trial court's original ruling operated as a judgment intended to be final and binding on all parties to the action, including Eryck.

Dorothy appealed the trial court's property distribution, claiming the court failed to apply the provisions of the 1973 post-nuptial agreement between her and Bruno. Dorothy's appeal put in issue the divorcing pair's relative entitlements to certain property, but did not affect the trial court's determination that Eryck was entitled to none of the coins or other property. Eryck did not appeal the judgment in the initial proceeding.

In the instant appeal, Eryck nonetheless claims the reversal of the initial decree, fortuitous though it may be from his standpoint, invalidates the initial decree in its entirety, thereby rendering void the writ and subsequent evidentiary hearing and making inapplicable the doctrine of res judicata to issues addressed in the hearing on the writ. We disagree.

■ As a general proposition, a judgment is final for purposes of res judicata until it is reversed on appeal, modified, or set aside in the court of rendition. *See Copper State Thrift & Loan v. Bruno,* 735 P.2d 387, 390 (Utah App.1987); *Berry v. Berry,* 738 P.2d 246, 249 (Utah App.1987). *See also Stoll v. Gottlieb,* 305 U.S. 165, 170, 59 S.Ct. 134, 137, 83 L.Ed. 104 (1938). The Restatement (Second) of Judgments indicates "a judgment otherwise final remains so despite the taking of an appeal unless what is called taking an appeal actually consists of a trial de novo." Restatement (Second) of Judgments § 13, comment f. *See A.B. Hirschfeld Press, Inc. v. Denver,* 779 P.2d 1356, 1359 (Colo.App.1988) (trial court's decision may have preclusive effect for res judicata or collateral estoppel purposes even though appeal of that decision is pending), *aff'd,* 806 P.2d 917 (Colo. 1991); *Bunnett v. Smallwood,* 768 P.2d 736, 740 (Colo.App.1988) (same), *rev'd in part,* 793 P.2d 157 (Colo.1990).[7]

Even when a judgment is ultimately reversed on appeal, as was the initial decree in this case, the reversal does not necessarily operate as an adjudication by the appellate court of any question other than those which were, in terms, discussed and decided by the appellate court. 5 Am.Jur.2d *Appeal & Error,* § 955 (1962). Thus, while a reversal effectively invalidates the prior judgment with respect to those issues addressed in the appeal, it "extends only to those issues which the appellate court de-

---

6. The trial court awarded Eryck a gun that was being held by the Utah County Constable.

7. Applying this general rule to the facts of this case, we note that while the initial decree was subject to reversal on appeal at the time of the evidentiary hearing, it was not yet reversed. Dorothy filed her notice of appeal on January 23, 1989. The hearing on the writ was conduct-ed on January 8, 9 and 22, 1990, and this court's reversal was issued on June 14, 1990. For purposes of res judicata, the initial judgment was in full effect at the time of the evidentiary hearing. Therefore, at that point in time, the trial court was entitled to rely on the decree as a final judgment.

cided in actuality or by necessary implication; it does not affect collateral matters not before the court." *Aye v. Fix*, 192 Mont. 141, 626 P.2d 1259, 1262 (1981).

■ Especially relevant to this case is the recognition that "any portion of a judgment not appealed from continues in effect, regardless of the reversal of other parts of the judgment." *Calistro v. Spokane Valley Irr. Dist. No. 10*, 78 Wash.2d 234, 472 P.2d 539, 540 (1970). *See Cowgill v. Raymark Indus., Inc.*, 832 F.2d 798, 802 (3rd Cir.1987) ("When a court of appeals reverses a judgment and remands for further consideration of a particular issue, leaving other determinations of the trial court intact, the unreversed determinations of the trial court normally continue to work an estoppel.")[8] *See also* 1B James Wm. Moore, et al., *Moore's Federal Practice* ¶ 0.416[2], at 517 (2d ed. 1992) (where judgment is reversed by appellate court on single ground with other determinations of the trial court left intact, "the unreversed determinations of the trial court are generally adhered to on remand"). Applying that rule of law to the scenario in the instant case, it may be stated that, if separate portions of a judgment apply to different parties to the same action, and if the party to whom a certain portion of the judgment applies fails to appeal that portion of the judgment, the judgment remains in effect as to that party even if other portions of the judgment are eventually reversed on appeal.

In the instant case, this court's reversal of the initial decree was very limited in scope, affecting only some aspects of the decree's divorce component. In *D'Aston v. D'Aston*, 808 P.2d 111 (Utah App.1990), this court held that the trial court incorrectly failed to apply the 1973 post-nuptial agreement in fashioning its property distribution. *Id.* at 115. Accordingly, this court remanded the case to the trial court for appropriate consideration of the 1973 agreement. *Id.* Our reversal required the trial court to reassess the previous judgment as between Bruno and Dorothy. The reversal in no way disturbed that part of the judgment concluding Eryck was entitled to none of the coins and other property at issue in that proceeding. Indeed, as previously mentioned, Eryck did not even appeal the initial decree.

■ Eryck claims that there was no issue in the initial proceeding as to who owned the coins and other property Bruno alleged were stolen and that there were no issues tried between Bruno and Eryck with respect to any property listed in the police report inventory, which was an exhibit to the decree. However, the record indicates that during the initial proceeding, ownership of the coins was indeed contested. Both Eryck and Bruno gave detailed testimony as to the ownership of certain coins, silver bullion, and other property. Bruno claimed he gave Eryck his start in coin collecting and testified as to which types of coins he had given Eryck over the years.[9] Bruno also testified that he saw Eryck and Dorothy at a coin show displaying some of the allegedly stolen coins. During the initial proceeding both Bruno and Eryck introduced lists of inventory. Bruno compared his list of missing coins to a list of Eryck's inventory and claimed as his own many of the items on Eryck's list.

In sum, the record indicates that the issue of ownership of the coins Bruno claimed were stolen was indeed adjudicated in the divorce proceeding. Therefore, the court's allocation of the coins only to Bruno and Dorothy constituted a judicial determi-

---

**8.** As the Court of Appeals for the Third Circuit observed, "[w]hen the estoppel is operative in proceedings in the same case on remand, courts frequently speak in terms of the law of the mandate or the law of the case rather than collateral estoppel but the underlying principle is the same." *Cowgill*, 832 F.2d at 802. " 'The judicial system's interest in finality and in efficient administration' dictates that, absent extraordinary circumstances, litigants should not be permitted to relitigate issues they had a fair opportunity to contest." *Id.* (quoting *Todd & Co., Inc. v. S.E.C.*, 637 F.2d 154, 156 (3rd Cir. 1980)). *See id.* at 802 n. 2 (discussing cases reaching a result similar to *Cowgill* based on a waiver rationale).

**9.** Bruno testified he helped Eryck for 10 years to build a hobbyist's coin collection. He consistently maintained that the total value of Eryck's collection would not exceed $5,000.

nation that Eryck was entitled to no interest in the coins. As mentioned, the only issue on appeal from the initial proceeding was whether the court erred in failing to apply the 1973 post-nuptial agreement to the property division as between Bruno and Dorothy. The determination that Eryck owned none of the coins was not appealed and therefore was not addressed by this court in that appeal.

Thus, the reversal of the divorce decree and remand for enforcement of the 1973 agreement did not affect the trial court's determination that Eryck was entitled to none of the coins because this court did not address that issue "in actuality or by necessary implication." *See Aye v. Fix*, 626 P.2d at 1262.[10] It follows, then, that the judgment in the initial proceeding remains final as to Eryck, despite this court's reversal of the property division as between Dorothy and Bruno.[11]

## D. Conclusion

The initial judgment against Eryck was not disturbed by Dorothy's appeal of the property distribution. Accordingly, our determination that the initial decree remains final as to Eryck renders his arguments

---

**10.** Eryck contends the rule of *Aye v. Fix*, that a reversal on appeal does not affect collateral matters, is inapposite because the trial court's initial decree awarding coins and other property to Bruno was the focus of the proceedings which are now on appeal. Thus, argues Eryck, the trial court's award of coins to Bruno is not a "collateral issue." While we agree that the trial court's award of coins *to Bruno* is not a collateral issue, this appeal involves the issue of ownership of coins as between Eryck and Bruno. The initial decree divided the coins between Bruno and Dorothy. In the first appeal, this court discussed only the correctness of that division, and reversed only the property division as between Bruno and Dorothy. On remand, the division of property as between Bruno and Dorothy may be modified, but that modification will not change the trial court's decision that Eryck was entitled to none of the coins at issue in the initial proceeding. Thus, whether *Eryck* is entitled to any of the coins and other property is an issue collateral to the issue decided by this court in the first appeal, and therefore remains unaffected by the narrowly drawn reversal of the property distribution. Finally, whether or not the coins are ultimately awarded to Bruno or Dorothy has no bearing on the trial court's determination that the coins do not belong to Eryck.

Eryck also argues that the question of his ownership of certain coins at issue in the hearing on the writ is inextricably intertwined with the property division between Dorothy and Bruno. This court's prior reversal, argues Eryck, requires the trial court's reconsideration of all findings underlying the decree, including those concerning the two consignments. Eryck claims that on remand the trial court may disregard the original findings and decide to award Bruno none of the coins or other property. Therefore, any evidence of Bruno's ownership of the coins and other property, which evidence was relied upon by.the court in the hearing on the writ, no longer controls as a result of this court's reversal of the initial decree.

Eryck's contention ignores language in this court's decision in *D'Aston v. D'Aston*, 808 P.2d 111 (Utah App.1990), indicating that, if anything, Bruno's position with respect to the coins only stands to be improved by application of the 1973 agreement. This court observed:

> Under the 1973 agreement, [Dorothy] received two parcels of real estate and cash. [Bruno] received all real property outside the United States; personal property in his possession, *which included $1 million in coins* and a collection of antique cars; and all domestic and foreign patents and patent rights. . . .

*Id.* at 112 (emphasis added).

**11.** Concerning Eryck's claim he was denied a "plenary" hearing on the issue of ownership of the seized coins, we note that although the trial court correctly prevented Eryck from presenting evidence on the issue of the consignments, Eryck was entitled to present evidence showing the coins seized from his place of business were not those that Bruno alleged were stolen from him. The record indicates that each party was given full opportunity to present evidence of ownership of the coins. While Eryck was not permitted to present evidence as to whether the consignments to Bruno actually occurred, Eryck was given ample opportunity to offer proof of ownership for each item he claimed as his, including seized items matching those described in the police report inventory as consigned items.

In its memorandum decision of March 9, 1990, the trial court held that Eryck had adequate opportunity to rebut or explain issues presented by Bruno. In its Findings of Fact and Conclusions of Law, the trial court concluded that "[t]hough given an opportunity, [Eryck] has not adequately explained why he had so many coins identical to [Bruno's] missing coins." It is clear from the record that Eryck was given the opportunity to prove ownership of all the coins seized and held by the court pursuant to the writ, even those coins and silver bullion Bruno claimed to have had on consignment. Thus, Eryck was not denied a "plenary" hearing.

regarding the validity of the writ and the applicability of res judicata unavailing. The Writ of Execution and Assistance was not rendered void by the reversal, and the trial court's subsequent Order and Decree remains in effect. At the evidentiary hearing, the trial court correctly refused to consider evidence regarding the consignment because the doctrine of res judicata barred Eryck from revisiting issues decided in the initial proceeding.

## II. ERYCK'S ADDITIONAL CLAIMS

 Apart from his challenges to the validity of the writ and the applicability of res judicata, Eryck presents additional issues for review.[12] He claims (1) Bruno failed to present sufficient evidence to satisfy his burden of proof of ownership and to support the trial court's findings of fact, and (2) the trial court committed reversible error by including certain items of property in its Order and Decree and post-trial orders.

### A. Sufficiency of the Evidence

 Eryck assails the trial court's findings of fact, contending Bruno's evidence was insufficient to satisfy his burden of proving with "reasonable certainty" that he owned the seized property. Eryck relies upon *Burgess v. Small*, 151 Me. 271, 117 A.2d 344 (Me.1955) for the proposition that Bruno was required to prove his title to the coins with "reasonable certainty." In Burgess the court observed:

> The degree of particularity with which identification must be made in proof of a conversion in a trover action will vary with the circumstances of the case. Where, as here, there is opportunity for commingling ... identification must be

made with *reasonable certainty....* "The rule as to circumstantial evidence in a civil case is that a party will prevail *if the preponderance of the evidence is in his favor.*"

.... The theory adopted by plaintiff must emerge as the most probable, and the evidence, if it is to suffice, must tend to eliminate other theories by force of the greater probability and rational consistency of the plaintiff's theory. This requirement is not met by wishful thinking or a likely guess.

*Id.* at 345–46 (quoting in part *Exchange State Bank of Glendive v. Occident Elevator Co.*, 95 Mont. 78, 24 P.2d 126, 129 (1933)) (emphasis added). The general proposition to be gleaned from the case is that a trial court's finding in a case of this type must be supported by some substantial evidence, not by mere conjecture. Eryck appears to argue principally that the trial court's frequent reference to the "reasonable inferences" it made in preparing its Findings of Fact and Conclusions of Law amount to "mere conjecture," and therefore fall short of the burden of proof discussed in *Burgess*. We disagree. The standard for proof of ownership as set forth in *Burgess* is in accordance with Utah Law addressing sufficiency of the evidence.

### 1. Standard of Review

 Under Rule 52(a) of the Utah Rules of Civil Procedure, the trial court's findings of fact "shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *See Peterson v. Peterson*, 818 P.2d 1305, 1307–08 (Utah App.1991). A finding of fact will be found clearly erroneous when it is contrary to the clear weight

---

**12.** The form of the "additional argument" as presented in Eryck's brief requires some comment. Instead of presenting his entire argument in the body of his brief, as required by Rule 24 of the Utah Rules of Appellate Procedure, counsel for Eryck submitted "additional argument" in the "appendix" to his brief. This "appendix" contains a separate table of contents, table of authorities, and an additional statement of facts. In effect, Eryck submits in his "appendix" an additional brief. Such use of an "appendix" or "addendum" is at odds with Rule 24(f), which reserves the addendum for reproduction of opinions, statutes, rules, regulations, documents, and other parts of the record pertinent to the issues on appeal. Rule 24 does not contemplate legal arguments in the addendum. Because no objection was raised to the format of Eryck's brief; because his additional arguments were addressed by Bruno, who thus was not misled by the peculiar organization of the brief; and because the peculiar organization was not a ruse for avoiding our page limitations, we reach the additional issues.

of the evidence, or if the appellate court has a "definite and firm conviction that a mistake has been made." *Cummings v. Cummings*, 821 P.2d 472, 476 (Utah App. 1991) (quoting *State v. Bobo*, 803 P.2d 1268, 1272 (Utah App.1990)). *See Doelle v. Bradley*, 784 P.2d 1176, 1178 (Utah 1989).

### 2. Credibility Determinations Based on Conflicting Evidence

█ In the instant case, regarding the coins stamped with the letter "A," Eryck concedes that Bruno testified at the hearing on the writ that the "A" coins were all his and that he never gave away or sold any of them. However, Eryck also claims Bruno's testimony that he never gave Eryck any "A" coins is, without corroboration, insufficient to prove "with reasonable certainty" that Bruno owned the seized "A" coins. Eryck bases his assertion on (1) the court's statement in its Memorandum Decision implying that Bruno's testimony was not credible, (2) testimony by other witnesses claiming to have purchased "A" coins from Bruno, and (3) Bruno's statements during the initial proceeding admitting that he sold "A" coins to others.

Eryck focuses on the trial court's Memorandum Decision of Jan. 31, 1990, wherein the court stated: "The Court feels that it has made a fair determination in this matter despite the lack of truthfulness which was apparent in the testimony of both parties." Characterizing this observation as a "conclusion," the thrust of Eryck's argument appears to be that because the trial court commented on the parties' lack of credibility, Bruno's evidence—his testimony—is necessarily legally insufficient to sustain the court's findings. Essentially, Eryck treats the trial court's general remark as a conclusive determination concerning the credibility of the parties. We read the trial court's statement differently.

█ Credibility determinations are within the sound discretion of the trial court. *See* Utah R.Civ.P. 52(a); *Riche v. Riche*, 784 P.2d 465, 467 (Utah App.1989). "Because the trial court alone can assess the demeanor and relative credibility of the witnesses [and] is charged with the fact

finding function ... we accord its actions broad deference." *Jackman v. Jackman*, 696 P.2d 1191, 1192 (Utah 1985). *See Peterson v. Peterson*, 818 P.2d 1305, 1307–08 (Utah App.1991) (appellate court "give[s] 'due regard' to the 'opportunity of the trial court to judge the credibility of the witnesses' ") (quoting Utah R.Civ.P. 52(a)).

Initially, the trial court suggested the testimony of *both* parties lacked credibility. However, the court did not identify particular untruthful statements by either party, nor did it specifically reject particular testimony. Despite this general observation the court, no doubt after some thought, went on to render findings of fact. Eryck's reading of the court's remark that the parties lacked credibility would have the effect of rendering the remark a "trump card" to be invoked for every finding of fact with which Eryck is displeased. This view of the trial court's statement is untenable.

In light of the trial court's unique opportunity to observe witnesses and assess their credibility, we will not interpret its generalized comment on the parties' credibility to mean the court discredited all of Bruno's testimony, especially that testimony upon which the court's findings were based. Had the trial court discerned serious problems with Bruno's testimony, the court's findings would have reflected such reservations.

Our review of the record indicates there is substantial record evidence to sustain the trial court's findings. For example, Eryck claims Bruno failed to prove with reasonable certainty that the "A" stamped coins seized from Eryck's place of business were his. Although Eryck presented the testimony of Gary Fernandez that he had seen "A" stamped coins in the possession of others, and that he in fact had "A" stamped coins in his possession at the time of the hearing, Bruno testified that he had never parted with any "A" stamped coins and that he had never done business with Mr. Fernandez. Moreover, Bruno also presented evidence showing that at least one of the coins identified by Fernandez as having Bruno's stamp in fact had an imitat-

ed stamp. In short, although the evidence presented concerning ownership of the seized "A" stamped coins was conflicting, the trial court's decision that Bruno met his burden of proving with reasonable certainty that he owned the "A" coins was adequately supported by the record.

Eryck also argues Bruno failed to meet his burden of proof with respect to the balance of the seized coins because, although he claimed ownership of virtually all the seized coins, Bruno admitted on cross-examination that he could not identify some of the unmarked coins as his own. In addition to his own testimony regarding the ownership of these coins, Eryck points to the expert testimony of Al Rust, a Salt Lake City coin dealer, who stated that none of the coins before the court were unusual, that the seized silver dollars were virtually impossible to identify on an individual basis, that the bullion was not identifiable, that many coins similar to those seized were available in Mr. Rust's own coin shop, and that all of the coins could be readily obtained in a relatively short time even if they were not on hand at a given coin store. However, a review of the record indicates evidence was presented showing that the numbers of the particular types of coins seized from Eryck matched almost exactly the numbers Bruno claims were stolen. Because the trial court's findings concerning the balance of the seized coins are not contrary to the clear weight of the evidence, we will not disturb them.

Finally, Eryck argues the trial court's findings are replete with "reasonable inferences" as to various matters, rather than being grounded firmly in tangible evidence. Thus, he contends, the findings do not reflect the level of "reasonable certainty" with which Bruno was required to prove ownership of the coins and other property. In so stating, Eryck confuses the quantum of evidence needed to support a finding with the separate question of Bruno's burden of proof. The trial court based its determination that Bruno met his burden of proving ownership of many of the stolen items on the following "reasonable inferences": (1) "much of the capital for codefendant [Eryck]'s recent purchases came

from the sale of plaintiff's coins, many of which are still missing," and (2) "[Eryck] had several coins in his possession identical to plaintiff's missing coins because those coins were actually taken by [Eryck]."

■ The finder of fact may draw reasonable inferences from the evidence presented, and may then base its findings of fact upon those reasonable inferences. *See Dougherty v. California–Pacific Utils. Co.*, 546 P.2d 880, 883 (Utah 1976) ("[I]t is the prerogative of the trial court to choose what evidence he will believe and also to deduce any inferences that can fairly and reasonably be drawn therefrom."); *Dempsey v. Joe Pignataro Chevrolet, Inc.*, 22 Wash.App. 384, 589 P.2d 1265, 1269 (1979) ("the trier of the fact may draw from the evidence all inferences fairly deducible therefrom"). This court has observed that "[a] reasonable inference is a conclusion arrived at by a process of reasoning. This conclusion must be a rational and logical deduction from facts admitted and established by the evidence, when those facts are viewed in the light of common experience." *Gillmor v. Gillmor*, 745 P.2d 461, 464 (Utah App.1987) (quoting *Bendorf v. Volkswagenwerk Aktiengesellschaft*, 90 N.M. 414, 564 P.2d 619, 624 (N.M.App. 1977)), *cert. denied*, 765 P.2d 1278 (Utah 1988). *Accord id.* at 466–67 (Jackson, J., concurring and dissenting). Moreover, "inferences drawn from circumstantial evidence can be as probative as direct evidence." *Id.* (quoting *Anderson v. Burlington Northern, Inc.*, 218 Mont. 456, 709 P.2d 641, 645 (1985)).

"When faced with a challenge to the sufficiency of the evidence, this Court is obliged to view the evidence *and all reasonable inferences* to be drawn therefrom in the light most favorable to the findings of the trial court." *Epic Assoc., 80–XX v. Wasatch Bank*, 725 P.2d 1369, 1371 (Utah 1986) (emphasis added). Because we conclude that the trial court appropriately based its findings on reasonable inferences and that those inferences are adequately grounded in the evidence, we find no error in the trial court's findings of fact based in whole or in part upon those inferences.

B. Correctness of Coin Distribution
in Order and Decree and Post–
Trial Orders

 Eryck also claims the trial court committed reversible error in including certain items of property in the decree and post-trial orders. In its January, 1990 Memorandum Decision, the trial court determined that the most reliable evidence that certain property belonged to Bruno was the police report inventory. Eryck claims that contrary to the trial court's direction in the Memorandum Decision, Bruno, in preparing the proposed order which was ultimately entered, included additional items that were not contained in the police report inventory. Eryck's claim of "additional" items is primarily addressed to the following: (1) an 18.5 gram gold nugget, (2) 84 common date "BU-dollars" and 60 common date "CIRC-dollars," (3) a 1914–S $20 U.S. gold piece, (4) a 1904–S U.S. gold coin, and (5) the consigned coins.

First, concerning the 18.5 gram gold nugget, Bruno's police report inventory lists an 84.5 gram Alaska gold nugget. Bruno testified that the designation of the nugget's weight at 84.5 grams was an error, because such a large nugget could only be found in a museum. Bruno then identified the 18.5 gram nugget as his. The trial court's finding that Bruno owned this gold nugget— i.e., that it is the same nugget identified on the police report inventory—is not contrary to the clear weight of the evidence and is therefore not clearly erroneous.

Second, regarding the 84 common date "BU-dollars" and 60 common date "CIRC-dollars", Eryck claims there was no evidence before the trial court to support any finding that these coins, listed as Bruno's in subsequent orders, were included in the police report inventory, especially in light of Bruno's testimony that such coins with common dates were unidentifiable. However, the police report shows a total of 520 common date BU-dollars and 440 common date CIRC-dollars were stolen from Bruno. Pursuant to the court's finding that Bruno owned all the seized coins matching coins listed on the police report inventory, the trial court awarded Bruno all BU-dollars and CIRC-dollars recovered from Eryck's place of business.

Concerning the fungible nature of these coins, we note that although Bruno himself testified that such coins were common and thus not readily identifiable, the court's findings regarding these coins are supported by reasonable inferences drawn by the trial court from other pivotal findings of fact. Because Eryck had in his possession unique and specifically marked coins and bullion, and because the trial court found that the "A" stamped coins and other, more traceable coins and bullion were indeed stolen from Bruno by Eryck, the court may have reasonably inferred from these facts that Eryck also stole the less traceable coins—the "BU-dollars" and "CIRC-dollars" which were found with the other items. This is true especially in light of the trial court's specific findings that Eryck failed to adequately explain why he had so many coins identical to Bruno's missing coins, and that within the few months prior to the hearing on the writ, Eryck made significant purchases and did not plausibly explain the manner and source of the funds used to make such purchases. Because the court's findings concerning the ownership of the coins listed on the police report inventory are not contrary to the evidence and the court's reasonable inferences, they are not clearly erroneous. Hence, we will not disturb the trial court's award of the BU- and CIRC-dollars to Bruno.

Third, concerning the 1914–S $20 gold piece, contrary to Eryck's contention, this coin was listed on the original police report inventory. The trial court's finding that Bruno owned all seized coins matching coins listed on the police report inventory is supported by substantial record evidence, and we discern no error in the court's award of this coin to Bruno.

Fourth, Eryck claims that because the 1904–S U.S. $20 gold piece was not listed on the original police report inventory, the court erroneously included it in Bruno's property award. However, the record reveals this coin was stamped with an "A." The trial court found that Bruno was the

owner of all "A" coins. As discussed previously, the trial court chose to credit Bruno's testimony concerning the "A" stamped coins and rejected Eryck's. Since the trial court's findings concerning the "A" coins are not clearly erroneous, we will not disturb them.

Finally, because we have previously concluded that the trial court correctly refused to hear evidence on the ownership of the consigned coins, we find no error in the court's awarding to Bruno all coins matching those items described in the police report inventory as consigned coins.[13]

### C. Other Claims

Both parties raise additional arguments. We have considered those arguments, and determine all but one to be without merit. *See State v. Carter,* 776 P.2d 886, 888 (Utah 1989) (appellate court "need not analyze and address in writing each and every argument, issue, or claim raised"); *Northern v. Barnes,* 825 P.2d 696, 699 (Utah App.1992). Eryck claims the trial court erred in allowing Bruno to include in his Memorandum of Costs a claim for attorney fees paid to an Oregon law firm in connection with the deposition of Michael Graham. This argument is well taken. Accordingly, the trial court's judgment for costs is vacated, with instructions to adjust the principal amount of the judgment for costs so as to delete that item.

### IV. CONCLUSION

This court's reversal of the decree of divorce in the initial proceeding did not invalidate the writ of execution and proceedings related to it. Because Eryck did

not appeal from the initial judgment, that judgment remained final as to him, despite this court's later reversal of a portion of that judgment as between Bruno and Dorothy. Consequently, the trial court in the hearing on the writ correctly applied the doctrine of res judicata in refusing to revisit the issue of ownership of the consigned coins, and Eryck was not otherwise denied a full and fair hearing on this issue.

The trial court's findings of fact were not contrary to the weight of the evidence and therefore are not clearly erroneous. Finally, we find no error in the trial court's inclusion of certain coins in its final decree and post-trial orders. Accordingly, we affirm all portions of the judgment in issue and vacate only the portion of the judgment awarding certain attorney fees as taxable costs of the action.

BILLINGS and JACKSON, JJ., concur.

---

13. Eryck mounts an additional challenge to the trial court's finding of fact number 7. Finding number 7 states, with our emphasis:

> Shortly after [Bruno's] personal property disappeared in April, 1986, [Bruno] was able to make a detailed list for the police department from his memory of many of the missing items. *Some of those items, while not exceptionally rare, would not be expected to appear in an average coin shop.*

Although he labels the last sentence of the finding clearly erroneous, Eryck wholly fails to demonstrate with authority or argument exactly how this finding is pivotal to the court's ultimate determination of this matter. Thus, we

decline to address this argument. *See, e.g., State v. Price,* 827 P.2d 247, 248–50 (Utah App. 1992) (court declined to address issue on appeal because "[d]efendant's brief does not enable us to locate errors in the record or demonstrate 'under applicable authorities' why the errors necessitate reversal") (quoting in part *Demetropoulos v. Vreeken,* 754 P.2d 960, 962 (Utah App.)), *cert. denied,* 765 P.2d 1278 (Utah 1988)); *State v. Garza,* 820 P.2d 937, 939 (Utah App. 1991) ("when an appellant's argument contains no citations to the record and no legal authority," court will decline to address issues raised), *cert. denied,* 843 P.2d 516 (Utah 1992).